Commonwealth *v.* Biebighauser, Appellant.

338

Argued April 20, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused February 23, 1973.

*T. Warren Jones,* with him *MacDonald, Illig, Jones & Britton,* for appellant.

*Bernard L. Siegel,* First Assistant District Attorney, with him *R. Gordon Kennedy,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, January 19, 1973:

The appellant was convicted by a jury in 1963 of the first degree murder of one Mary Lynn Crotty. No post-trial motions were filed at that time and appellant was sentenced to life imprisonment. In 1970 appellant filed a petition under the Post Conviction Hearing Act, Act of January 25, 1966, P. L. (1965) 1580, §1, 19 P.S. §1180-1 et seq., asserting that he had failed to appeal his conviction because of fear of the imposition of the death penalty on retrial. After a hearing appellant was permitted to file post-trial motions *nunc pro tunc*. See *Commonwealth v. Littlejohn*, 433 Pa. 336, 250 A. 2d 811 (1969). Motions for a new trial and in arrest of judgment having been denied, the present direct appeal from the judgment of sentence was brought. Four issues are presented: (1) whether appellant's confession was voluntary; (2) whether several warrantless searches were proper under the Fourth Amendment; (3) whether voir dire examination was unduly restricted; and (4) whether the introduction into evidence of allegedly inflammatory photographs was so prejudicial as to warrant reversal. Concluding that all four challenges are without merit, we will affirm the judgment of sentence.

## VOLUNTARINESS OF THE CONFESSION

At trial the Commonwealth introduced into evidence appellant's nine-page signed confession. This statement described the circumstances surrounding the murder of Mary Lynn Crotty substantially as follows: On Saturday evening, January 19, 1963, appellant was introduced to the deceased by her college roommate, Paulette Cywinski. Miss Cywinski had a date with another person, and the two couples spent the evening drinking and dancing at various night spots in the City of Erie. In the early morning hours of Sunday, Janu-

ary 20, the couples went their separate ways. Miss Crotty asked appellant to take her home stating that she was feeling ill. Biebighauser drove, instead, to a point on East 38th Street in Erie where he stopped the car and proceeded to choke Miss Crotty into unconsciousness. He then placed her in the back seat, and raped her. When Mary Lynn began to regain consciousness, appellant strangled her once again, this time to death. Again he indulged in sexual congress with the now deceased victim. When this was completed, appellant placed the body in the trunk of his car, and returned home.

The following afternoon, according to the evidence, appellant visited the home of the victim's parents. Concerned over their daughter's failure to return home, they had spoken also with Paulette Cywinski and her escort. A friend and neighbor of the Crottys, Detective Penman of the Pennsylvania State Police, was present when Biebighauser called. Biebighauser told Mr. and Mrs. Crotty that he had been with the deceased on Saturday night, had dropped her off near her home early Sunday morning and had not seen her since. After this visit, according to appellant's statement, he drove to a secluded wooded area where he left the body of the deceased in a snow bank and then scattered her clothing along the highway.

The record establishes the following circumstances surrounding the taking of the confession: At approximately 1:00 p.m. on Monday, January 21, 1963, Detective Penman, accompanied by another police officer, went to appellant's apartment to question him further about the disappearance of Mary Lynn Crotty. Appellant agreed to move the interview to the police station, wishing to have it out of the presence of his wife. At 3:00 p.m., after some forty-five minutes of questioning during which he repeated his account that he had left Miss Crotty near her home early Sunday morning, ap-

pellant suddenly changed his story. He stated that he knew the girl was dead; and that he had killed her. He led the police to the site where he had disposed of the body. From 3:00 p.m. to 8:00 p.m., accompanied by several police officers, appellant retraced his steps of Saturday night and pointed out the location of the body and the clothing of the deceased. There was intermittent questioning of appellant during this period.

At 8:00 p.m., appellant was returned to the police station. He was given a chicken dinner shortly after 9:00 p.m. Starting at 9:30 p.m., and concluding at approximately 1:00 a.m. the next morning (Tuesday, Jan. 22), appellant gave the formal confession which he now challenges.[1]

The trial of this case took place prior to the decisions of the Supreme Court of the United States in *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977 (1964) and *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed.

---

[1] Appellant objected for the first time to the introduction of the confession at his 1963 trial, and the question of voluntariness was submitted initially to the jury. This procedure was standard practice in Pennsylvania prior to the decision of the Supreme Court of the United States in *Jackson v. Denno,* 378 U.S. 368, 12 L. Ed. 2d 908 (1964), requiring a separate judicial determination of voluntariness. See Pa. R. Crim. P. 323 (Suppression of Evidence) adopted March 15, 1965, effective September 15, 1965. *Jackson* has been accorded retroactive effect. See, e.g., *Commonwealth ex rel. Butler v. Rundle,* 416 Pa. 321, 206 A. 2d 283 (1965). Appellant in his brief concedes that the *Jackson* requirement of a separate judicial hearing has been complied with, presumably by means of the 1970 PCHA hearing, which contained extensive testimony on the voluntariness issue. This evidence was later considered by the court *en banc* when denying the motion for a new trial on the ground that the confession was invalid. Coincidentally, after briefs were filed and arguments heard in this case, the Supreme Court of the United States held a similar post-trial determination of voluntariness to have been procedurally adequate and substantively acceptable under the due process clause. *Swenson v. Stidham,* 409 U.S. 224, 41 U.S.L.W. 4077 (1972).

2d 694 (1966). Under the standards prevailing before those holdings, a confession to be admissible in evidence must have been voluntary under all the circumstances, i.e., must have been the product of the defendant's free will. See e.g., *Commonwealth ex rel. Butler v. Butler*, 429 Pa. 141, 149, 239 A. 2d 426 (1968). Appellant contends that under this test his statement was involuntary.

Appellant's first assault on the confession is that the above circumstances are substantially the same as in *Butler*, supra, where we held that a defendant from whom a confession was taken in 1940 "has indeed been overreached, that his will has been overborne, and that his confession is not voluntary." The surrounding circumstances in *Butler* clearly showed such overreaching. These are summarized thus in our opinion: "Where an individual has been subjected to virtually continuous interrogation by several officers for a period of 10 hours; where he was not warned of his right to counsel and his privilege to remain silent; where he was not taken before a magistrate until a week after he was taken into custody; and where his ability to resist questioning is limited both by his ninth grade education and the wounds he received during his capture, then he has been deprived of the 'free and rational choice' necessary to make a confession voluntary." 429 Pa. at 151.

While the eleven-hour time span from the start to conclusion of police interrogation in this case approximates the ten-hour period in *Butler*, supra, the similarity ends there. The instant circumstances are more analagous to those in *Commonwealth v. Graham*, 408 Pa. 155, 161, 182 A. 2d 727 (1962), where *"there were no long and protracted periods of constant and continuous questioning. On the contrary, there were long and ample periods of rest."* (Emphasis in original.) It should be emphasized, moreover, that Biebighauser made his initial and crucial confession after not more

than 45 minutes of questioning. The taking of a formal statement was put off for some six hours until after the police had located the body of Miss Crotty and to allow appellant a rest period of over an hour, and a complete meal. Appellant himself testified at his PCHA hearing that the police made no promises, exerted no physical force, "didn't do anything".

Appellant contends, nevertheless, that the confession was invalid because he was of questionable mental capacity, and because he had not been warned of his rights to counsel and to remain silent. The record fails to bear out these lines of attack. Appellant had attended high school, was fully literate, was 21 years of age and married, and able to manage his own affairs. His two psychiatric expert witnesses, while giving it as their opinion that he had a "personality disorder", stated that Biebighauser was a person of average intelligence. In short, there was no showing either at trial or at the PCHA hearing that the confession resulted from any lack of understanding on appellant's part.

As to warnings, there was testimony by the Commonwealth that defendant refused counsel at the time he was being interrogated. But even if no warnings were given as to the right to counsel or to remain silent, their absence would not of themselves vitiate this 1963 confession. *Commonwealth ex rel. Joyner v. Brierley,* 429 Pa. 156, 160, 239 A. 2d 434 (1968).

We are of the opinion, in summary, that in light of all the evidence the challenged confession was voluntary.

### Search and Seizure

Pursuant to their investigation into the disappearance of Mary Lynn Crotty, the police conducted warrantless searches of appellant's car, wallet, and apartment. Arguing that the Commonwealth proved neither

exigent circumstances nor his consent for the various searches, appellant urges us to reverse his conviction.

The following items were seized from the car—a comb, a hairpin, and two pencil sketches of nude women; from the wallet—a pistol application; from the apartment—a navy pea jacket and a pair of blood-stained jockey shorts. An examination of the record convinces us that whether or not the searches of the automobile and the wallet were valid is irrelevant.[2] Neither the comb nor the hairpin were offered in evidence and the pistol application, though received, seems to have been irrelevant or, at the most, of minimal probative value. Moreover, it was not objected to. As to the nude sketches, defense counsel specifically stated that he had no objection to their introduction. Clearly, this was deliberate trial strategy aimed at bolstering the defense of a psychosis amounting to legal insanity. Appellant thus failed to demonstrate any prejudice from the searches resulting in the seizure of these items.

The apartment search took place on Thursday, January 24, 1963, by Detective Penman and another police officer. Appellant was then in custody, but his wife was at home. Both officers testified that Mrs. Biebighauser consented to the ensuing search, which uncovered the jacket and underwear in the bedroom closet. Both the bedroom and closet were areas shared equally by appellant and his wife. Under these circumstances, the wife's consent to the search was valid. *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564 (1971).

---

[2] The automobile search was conducted on Monday, January 21, 1963, by Detective Penman during his visit to appellant's apartment. The testimony of the police officer and appellant was conflicting as to whether the latter voluntarily consented to the search. The lower court found it unnecessary to resolve the dispute. At the police station that same day appellant's wallet was also searched; no explanation for this action appears in the record.

## Voir Dire Examination

On the voir dire examination, the trial court refused to allow defense counsel to propound the following two questions:

"Q. Do you have any prejudice against the defense of insanity which would prevent you from fairly deliberating and considering testimony of a psychiatric nature in behalf of the defendant?

"Q. If the testimony proves by a preponderance of evidence to your satisfaction that defendant is legally insane, would you nonetheless be reluctant to return a verdict of not guilty by reason of insanity if you were not informed by the court of the consequences of such a verdict with respect to future confinement of the prisoner?" This refusal is assigned as reversible error.

In *Commonwealth v. McGrew*, 375 Pa. 518, 525, 100 A. 2d 467 (1953), we said that "The examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury: Commonwealth v. Thompson, 328 Pa. 27, 31, 195 A. 115; Commonwealth v. Henderson, 242 Pa. 372, 378, 89 A. 567 . . . [C]ounsel . . . should [not] be permitted . . . to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case. While considerable latitude should be permitted on a voir dire, the inquiry should be strictly confined to disclosing qualifications or lack of qualifications of a juror and whether a juror has formed a fixed opinion or may be otherwise subject to disqualification for cause. Cf. Commonwealth v. Bentley, 287 Pa. 539, 546, 135 A. 310; Commonwealth v. Van Horn, 188 Pa. 143, 165, 41 A. 469; Commonwealth v. Henderson, 242 Pa. 372, 89 A. 567; Traviss v. Commonwealth, 106 Pa. 597; Commonwealth v. Thompson, 328 Pa. 27, 195 A.

115." It is not the purpose of voir dire to provide counsel a better understanding upon which to base his peremptory challenges. *Commonwealth v. Lopinson,* 427 Pa. 284, 297, 234 A. 2d 552 (1967).

It is well-settled that the scope of voir dire examination rests in the sound discretion of the trial judge and his decisions, even in a challenge for cause, will not be reversed except for a palpable abuse of discretion. See e.g., *Commonwealth v. Lopinson,* supra; *Commonwealth v. McGrew,* supra. Reflection upon the proposed questions in this case leaves us uncertain as to their probable effect if allowed; i.e., whether they would have assisted in securing a fair and impartial jury or whether "their evident purpose [was] to have the jurors indicate in advance what their decisions [would] be under a certain state of the evidence or upon a certain state of facts, and thus possibly commit them to definite ideas or views when the case [should] be finally submitted to them for decision." *Commonwealth v. Bentley,* supra, 287 Pa. at 546. Had the court permitted the two questions to be asked, we think it would not have been in error, but by no means did it commit a palpable abuse of discretion in excluding them. *Commonwealth v. Henderson,* 242 Pa. 372, 89 A. 567 (1913).

### Introduction of Photographs

Appellant's final contention is that two photographs of the nude body of the deceased introduced over objection at trial were both irrelevant and highly prejudicial. While we agree that the pictures should probably have been excluded because they had so little evidentiary value, we perceive no reversible error in their admission.

The pathologist who examined the body of the victim testified for the Commonwealth that death resulted from asphyxia due to strangulation, caused by pressure

being applied around her neck from cloth or a fine rope or wire. He gave it as his opinion that multiple stab wounds on the chest of the deceased had been inflicted after death, since there was no hemorrhaging into those wounds. The lower court was of the opinion that the medical testimony of the witness needed visual clarification and therefore allowed the two challenged exhibits to be shown to the jury.[3] They pictured, in black

---

[3] No categorical objection was made to the photographs. Defense counsel expressed the view that admissibility should depend on whether the physician, in his own opinion, "was capable of describing these wounds adequately and sufficiently". The trial judge, Judge Burton C. LAUB, on the contrary, ruled that it was the court's function, not the doctor's, to determine whether the medical testimony required photographic elucidation. Said Judge LAUB: "Now, from the very nature of the description given and from the Court's scrutiny of the photographs, the Court is of the opinion that it is necessary that these photographs be shown to the jury briefly and with cautionary instructions to the jury. Otherwise, many portions of the doctor's testimony in our opinion, would be obscure and perhaps completely not understandable." The showing of the photographs to the jury was preceded by cautionary instructions by the judge, as follows:

"By the Court:

"Members of the Jury, we are about to permit Dr. Fust to show you the marks, abrasions and wounds which he found using the two photographs of Mary Lynn Crotty's body to illustrate his testimony.

"Now, I want to caution you right from the very beginning that the sight of a person who has suffered a violent death in a photograph is quite apt to excite the jury's passion, is quite apt to stir up a feeling of revulsion, and is quite apt to work an unjust result insofar as the defendant in a criminal case is concerned,—unless the jury realizes and understands its duty with respect to these photographs. In other words, you are not under any circumstances, to allow these photographs to inflame you against the defendant, you are not to allow them to create any passion or prejudice against this defendant, but you must receive them only for the purpose for which they are being shown to you, and that is for the purpose of demonstrating the doctor's testimony which, in some degree, is probably as obscure to you as it is to me because, couched in medical terms in some instances are

and white, the body of the deceased in the morgue three days after her murder. The pathologist pointed out to the jury two parallel lines running around the neck and some fifteen stab wounds of the chest, an inch to one and one-quarter inches in length.

An examination of the challenged photographs, coupled with a careful reading of the pathologist's testimony, convinces us that the exhibits were but of marginal relevance. While the evidence of strangulation depicted in the photographs did bear on the corpus delicti, that had been adequately established and described in the testimony of the pathologist. The stab wounds inflicted *post mortem* were by hypothesis of no evidentiary value to establish the manner or cause of death under the theory of murder advanced by the Commonwealth. We therefore have serious doubt as to the correctness of the trial judge's determination of the character of the pictures as an essential evidentiary adjunct of the medical testimony, which was the criterion before as well as after this 1963 trial. See *Commonwealth v. Smalls,* 449 Pa. 15, 295 A. 2d 298 (1972); *Commonwealth v. Sullivan,* 446 Pa. 419, 435, 286 A. 2d 898 (1971) (opinion in support of affirmance); *Commonwealth v. Wilson,* 431 Pa. 21, 37, 244 A. 2d 734 (1968); *Commonwealth v. Powell,* 428 Pa. 275, 278, 241 A. 2d 119 (1968); *Commonwealth v. Dickerson,* 406 Pa. 102, 109, 176 A. 2d 421 (1962); *Commonwealth v. Novak,* 395 Pa. 199, 212, 150 A. 2d 102 (1959).

However that may be, two factors combine to satisfy us that any prejudice which resulted was not sufficient to compel a new trial. First, the two photographs were shown to the jury for at most a total of three or four

descriptions of portions of the body with which you may not be familiar. Now, we are not going to allow you to have a protracted examination of these photographs, but we are going to allow the doctor to show them to you and explain his testimony with respect to the wounds. . . ."

minutes out of a total trial time of 6½ days; they were accompanied by immediate and complete cautionary instructions,[4] and they were not sent out with the jury. Second, appellant's defense was that of insanity, not that he had not in fact killed the deceased, nor that the severity of the crime was less than first degree. His confession, already in evidence, clearly established the presence of all elements of first degree murder. While inflammatory photographs may prejudice a defendant who is challenging the degree of his guilt, and perhaps also his perpetration of the crime, it is possible that they may redound to the benefit of a defendant asserting insanity. When faced with the unappealing pictures of the corpse of a young lady stabbed fifteen times after she had already been stranged to death by her assailant, the chances were enhanced that the jury would consider such mutilation as possible only to a deranged mind.

Judgment of sentence is affirmed.

Mr. Justice MANDERINO dissents.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

Although the majority finds, after a "careful reading of the pathologist's testimony," that the photographs introduced at appellant's trial "were but of *marginal relevance*" and that ". . . [t]he stab wounds inflicted *post mortem* [and gruesomely obvious in the

---

[4] In *Commonwealth v. Powell*, supra, we held that cautionary instructions cannot remedy the initial error of admitting the photographs. We hold to that viewpoint today. We believe, however, that just as proper warnings from the court are required to minimize the potentially inflammatory effect of properly admitted photographs, see e.g., *Commonwealth v. Robinson*, 433 Pa. 88, 249 A. 2d 536 (1969), so where the photographs are subsequently held inadmissible, the presence of proper cautionary instructions such as were here given (see footnote 3, *supra*) should be relevant on the question of resulting prejudice.

photographs] were by hypothesis of *no evidentiary value* to establish the manner or cause of death under the theory of murder advanced by the Commonwealth," it nonetheless holds their introduction to be non-reversible error. (Parenthetical and emphasis added.) I must dissent.

The majority advances two theories, both unfounded in law or reason, in support of its determination. First, the majority theorizes that because the photographs were exhibited for only three-four minutes during the course of a six and one-half-day trial, their impact was minimized. When viewed even briefly, the sight of these pictures shocks and haunts the memory for a period of time which clearly extends beyond the actual viewing period. It is sheer speculation to assume that the prejudice which flowed from the jury's exposure to these photographs only lasted but a brief period. A quick glimpse at these pictures clearly refutes the majority's unsupported conclusion.

Secondly, the majority states that these irrelevant and prejudicial photographs were of aid to appellant in that the ". . . chances were enhanced that the jury would consider such mutilation [a young lady stabbed fifteen times, *after she had already been strangled to death*] as possible only to a deranged mind." (Parenthetical and emphasis added.) This assertion, too, is untenable since defense counsel, the one in control of and most conscious of the defense's case, objected to the introduction of these photographs. It was obviously his considered opinion that these pictures were irrelevant and prejudicial rather than, as the majority assumes, helpful.

The law is well settled in this Commonwealth that ". . . the admission of photographs exhibiting the body of a deceased in homicide cases is primarily within the discretion of the trial judge. Unless there is a flagrant abuse of discretion, this Court has been loath to con-

clude that reversible error exists." *Commonwealth v. Powell*, 428 Pa. 275, 278, 241 A. 2d 119, 121 (1968), and the cases cited therein. See also *Commonwealth v. Eckhart*, 430 Pa. 311, 242 A. 2d 271 (1968).

In determining whether such a "flagrant abuse of discretion" occurred, the test, as set out in *Powell*, supra at 278-79, 241 A. 2d at 121, to be applied is *". . . whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors."* (Emphasis added.)

Clearly, on this record, where even the majority concedes that the pictures had little or no relevance, there was no "essential evidentiary value" which "outweighed the likelihood of inflaming the minds and passions of the jurors." As the majority correctly notes, the photographs, depicting a nude three-day-old corpse, which had been stabbed fifteen times after death had occurred, has no relevancy in proving, as the Commonwealth argued, that the victim's death resulted from strangulation. The pathologist's testimony was more than adequate to establish this fact, which was not contested at trial.

Moreover, the majority is in error in its pronouncement that the existence of cautionary instructions should be considered in determining the severity of the prejudice caused by the improper introduction of the photographs. As this Court stated in *Powell*, supra: "The fact that the trial judge specifically informed the jury that the photographs were not being shown for prejudicial or inflammatory purposes, but only to aid in the presentation of medical testimony, *is of no consequence and could not remedy the error which already had been committed."* 428 Pa. at 279 n. 1, 241 A. 2d at 121 n. 1 (emphasis added).

Accordingly, applying the *Powell* standard, supra, it must be concluded that the photographs should have

been excluded. As we did in *Powell,* supra, and *Eckhart,* supra, a new trial should be granted.

Mr. Justice Nix joins in this dissenting opinion.