420 A.2d 694

**COMMONWEALTH of Pennsylvania**

v.

**Gary SHORT, Appellant.**

Superior Court of Pennsylvania.

Submitted March 23, 1979.

Filed June 13, 1980.

582

John W. Packel, Chief, Appeals, Assistant Public Defender, Philadelphia, for appellant.

584

·Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

PRICE, Judge:

Pursuant to a jury trial commenced on February 14, 1978, appellant was convicted of possession of an instrument of crime generally,[1] burglary,[2] theft by unlawful taking or disposition,[3] rape,[4] involuntary deviate sexual intercourse,[5] unlawful restraint,[6] simple assault,[7] and aggravated assault.[8] Post–trial motions were denied and appellant was sentenced on May 24, 1978.[9] He now alleges several instances of error in the trial court.

The pertinent testimony presented at trial is as follows. The nine year–old victim testified that during the late afternoon of September 6, 1977, she was playing with a friend near her house on Allison Street in Philadelphia. At that time, appellant, whom the victim had known for some two months, approached her and asked her if she wished to see a clubhouse. The victim agreed, and he did indeed take

1. 18 Pa.C.S. § 907(a).

2. 18 Pa.C.S. § 3502.

3. 18 Pa.C.S. § 3921.

4. 18 Pa.C.S. § 3121.

5. 18 Pa.C.S. § 3123.

6. 18 Pa.C.S. § 2902.

7. 18 Pa.C.S. § 2701.

8. 18 Pa.C.S. § 2702.

9. Appellant's sentences were as follows: ten to twenty years imprisonment on the rape charge; a concurrent term of two and one–half to five years on the possession of instruments of crime generally charge; an identical concurrent term on the unlawful restraint charge; a consecutive ten to twenty year term on the involuntary deviate sexual intercourse charge; a consecutive five to ten year term on the aggravated assault charge; and a consecutive five to ten year term on the burglary charge.

her to a clubhouse.  Appellant then asked the victim if she would like to accompany him to his apartment to procure some wood for another clubhouse.  The victim assented, and after a momentary stop at home, she accompanied appellant to an apartment on Woodland Avenue.  Appellant kicked the door of the apartment open and the pair entered.  Once inside, appellant struck the victim in the face, ordered her to disrobe, raped her repeatedly, and forced her to perform oral sex.  He next choked the victim with her own underpants and concluded by hurling a table toward her head.  Appellant was seventeen years old at the time of the offense.

Also testifying for the Commonwealth, Mr. George Mullen stated that he lived in a third floor apartment at 5434 Woodland Avenue.  When he returned from work on September 6, 1977, Mr. Mullen noticed that the lower panel of his door had been knocked out.  He entered the apartment and heard tapping coming from a locked closet; a closet that had been open earlier in the morning.  Opening the closet door, he found the victim naked, crumpled over, and bleeding profusely from the head and around the eyes.  He procured the aid of the police, handed the victim over to them, and accompanied the police to the local station.  Upon returning to his apartment, he found a radio and ten to fifteen dollars in cash missing.

Officers Benjamin Boyce and Edward Garvin testified that on the evening of the incident, they were patrolling the city when they received word of an emergency hospital case.  They proceeded to 5434 Woodland Avenue in their emergency patrol wagon and there met several officers already on the scene attending the victim.  During the trip to the hospital, the victim responded to questions asked by the officers and stated that "Gary" or "little man" beat her.  Evidence was later adduced that appellant was known as "little man."

Finally, Dr. James Fox testified that the victim had suffered five facial fractures, including one of the right orbital floor which resulted in the eye dropping back in its socket.  That condition, as well as double vision, will be permanent physical after—effects of the incident.

Appellant's first contention is that at the time of the hearing to certify him for trial as an adult, the Commonwealth did not establish a prima facie case [10] because the victim was not competent to testify. He bases this conclusion on the argument that the victim was not cognizant of her responsibility to tell the truth, nor did she recognize the possibility of divine retribution inherent in the oath if she lied. With this, we must disagree.

Initially, we note that the determination of a witness' competency to testify is left to the sound discretion of the trial judge, and we will not reverse his ruling on the matter absent a flagrant abuse of that discretion. *Commonwealth v. Baker*, 466 Pa. 479, 353 A.2d 454 (1976); *Commonwealth v. Hall*, 267 Pa.Super. 204, 406 A.2d 765 (1979); *Commonwealth v. Payton*, 258 Pa.Super. 140, 392 A.2d 723 (1978); *Commonwealth v. Mangello*, 250 Pa.Super. 202, 378 A.2d 897 (1977). Indeed, as we noted in *Mangello*, Wigmore suggests that appellate courts should virtually never reverse such rulings; the better practice being to accept the testimony on its face and leave the matter of credibility to the fact finder. *Commonwealth v. Mangello, supra*, 250 Pa.Super. at 205–06, 378 A.2d at 898–99. *See* VI Wigmore on Evidence § 1821 (Rev. ed. 1976).

With this truncated scope of review in mind, our starting point is the principle that competency of a witness is presumed, and the burden falls on the objecting party to demonstrate incompetency. *Rosche v. McCoy*, 397 Pa. 615, 156 A.2d 307 (1959); *Commonwealth v. Mangello, supra.* When the witness is under fourteen years of age, there must be a searching judicial inquiry as to mental capacity, but discretion nonetheless resides in the trial judge to make the ultimate decision as to competency. As enunciated in *Rosche v. McCoy, supra*, 397 Pa. at 620–21, 156 A.2d at 310, that decision is based on three criteria:

10. Such a finding was required by the then applicable Juvenile Act, Act of Dec. 6, 1972, P.L. 1464, § 28, 11 P.S. § 50–325 (Supp.1976–77), *repealed*, Act of April 28, 1978, P.L. 202, § 2(a) (effective June 27, 1978). We note that in his brief, appellant erroneously refers to the September 30, 1977 certification hearing as a preliminary hearing.

"There must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering *what it is* that she is called to testify about and (3) a consciousness of the duty to speak the truth." (Emphasis in original).

■ Appellant focuses on this third requirement and argues that the victim's terse yes and no answers to counsel's questions on the nature of truth and the obligation of the oath, her inability to give an example of an action which would constitute lying, and her failure to recognize the concept of divine retribution indicate her failure to comprehend "the duty to speak the truth."

While we agree that the cold record does indicate some hesitancy on the child's part in answering the questions,[11]

11. The pertinent portion of the victim's testimony at the certification hearing was as follows:

"Q. [Assistant District Attorney] Do you go to Sunday School or church?
A. No.
Q. Do you know who could punish you if you told a lie now?
A. Yes.
Q. Who could?
A. The Judge.
Q. Do your parents teach you to tell the truth?
A. Yes.
Q. Would they punish you if you told a lie?
MR. GLOVIN [Counsel for Appellant]: Objection.
A. Yes.
THE COURT: Well, she's answered. Don't lead her, MR. CONNARD.
Q. Are you going to tell us the truth today about this?
A. Yes.
. . . .
[BY MR. GLOVIN:]
Q. Do you know what an oath means?
A. No.
Q. You said it would be okay to tell the truth but wrong to tell a lie. What is the difference between a truth and a lie?
A. I don't know.
. . . .
Q. Now, do you believe in God, Rita?
A. Yes.

this does not necessarily signify an abuse in the trial court's discretion. As we have previously noted,

"There is more to a child's consciousness of the duty to speak the truth than being able to give a clear example of a lie or to understand the concept of an 'oath'. In fact, the trial judge's opportunity to observe the demeanor, alertness, thoughtfulness, and sincerity of a child witness may be more informative than the answers the child gives to questions such as 'What is a lie?' and 'What will happen to you if you tell a lie?' *See Commonwealth v. Mangello,* 250 Pa.Super. 202, 206, 378 A.2d 897, 899, *allocatur refused,* [250] Pa.Super. [xxxvi] (1977)." *Commonwealth v. Payton, supra,* 258 Pa.Super. at 143, 392 A.2d at 725.

The victim indicated that she knew what the truth meant and that the judge and her parents would punish her if she told a lie. This is sufficient to indicate her cognizance of the possibility of punishment in response to false statements. We have previously held that this requirement is satisfied by a similar recognition of punishment. *Commonwealth v. Riley,* 458 Pa. 390, 326 A.2d 384 (1974) (six year–old witness stated that he would "go to the devil" if he were to lie); *Commonwealth v. Hall, supra* (43 year old epileptic found competent by virtue of belief that he would "get sent to prison" if he lied); *Commonwealth v. Payton, supra* (six year–old child testified that her mother would punish her if she told a lie); *Commonwealth v. Hughlett,* 249 Pa.Super. 341, 378 A.2d 326 (1977) (twelve year–old witness testified that she would go to hell were she to lie).

Nevertheless, appellant argues strenuously that the witness' answers here did not comport with the standard estab-

Q. You stated it would be wrong to tell a lie. Why would it be wrong to tell a lie?
A. Because you would get in trouble.
. . . .
Q. Now, you stated you would get in trouble if you told a lie. How would you get in trouble?
A. My mother would beat me.
Q. Your mother would beat you?
A. Yes.
Q. Is that the only reason it's wrong to tell a lie?
A. Yes." (N.T. Certification Hearing 17–21).

lished in *Commonwealth v. Rimmel*, 221 Pa.Super. 84, 289 A.2d 116 (1972). In *Rimmel*, this court granted a new trial based upon our finding that a colloquy conducted of seven and eight year–old girls was inadequate to establish competency. During that colloquy, the girls responded that they would be "hollered at" or "beaten" if they did not tell the truth. There was no further attempt to elicit the girls' conception of moral responsibility or divine retribution nor of their comprehension of the difference between truth and falsehood. While *Rimmel* has never been overruled, it was criticized and confined to its facts in *Commonwealth v. Mangello, supra*. Hence, as in *Mangello*, we are not disposed to apply *Rimmel* to the facts of this case. We therefore, conclude that the witness exhibited a sufficient awareness of her moral responsibility to testify truthfully, and that the trial judge did not abuse his discretion in finding her competent.

■ Appellant next attacks the suppression court's failure to suppress certain evidence seized pursuant to a purportedly invalid search warrant. That warrant recites in part as follows:

"The Mobile Crime Lab, Technicians Genoy & Jackson examined the scene for prints. They found evidence of a shoe print on the door of apt. at 5434 Woodland Ave.

. . . . .

The assigned *believes* that the low cut black sneakers worn by the Defendant at the time he gave himself up, 1:00 PM, 9–7–77, are the same sneaks used at the time of the rape and assault. These sneaks *are believed* to match the prints lifted by the Police Mobile Crime Unit on 9–6–77 at res. 5434 Woodland Ave. The shirt and pants *are believed* to have blood and semen stains on them from the rape and assault." (Emphasis added).

Appellant argues that because the warrant application must allege *facts*, and not conclusions, which would enable an issuing authority to make an independent determination that illegal activity was afoot and that a search would be reasonable and supported by probable cause, *Spinelli v.*

*United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the use of the word "belief" in the present warrant fails to meet that standard. We disagree.

In *Commonwealth v. Chumley*, 482 Pa. 626, 394 A.2d 497 (1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1515, 59 L.Ed.2d 781 (1979), our supreme court was faced with a similar question. In that case, the warrant recited, *inter alia*, that the officers who arrested the defendant's accomplice observed his tennis shoes and "believed" that the tread markings were identical to tracks observed at the scene of the homicide. Just as in this case, the defendant contended that a statement of "belief" was insufficient to support a finding of probable cause. The *Chumley* court concluded that a motion to suppress filed on the theory that the affidavit should have alleged that the markings "were" identical would have been frivolous. We reach a similar conclusion here.[12]

Appellant next argues that the trial court erred in not dismissing for cause a prospective juror who allegedly could not maintain an impartial attitude. Prior to examining the witness' answers, we first note certain general principles relevant to the voir dire examination and jury selection.

The sole purpose of the voir dire examination is to provide the accused with a "competent, fair, impartial and unprejudiced jury." *Commonwealth v. Biebighauser*, 450 Pa. 336, 345, 300 A.2d 70, 75 (1973). *See Commonwealth v. Dukes*, 460 Pa. 180, 331 A.2d 478 (1975). Nevertheless, voir dire is not designed to provide a defendant with twelve persons devoid of emotion or opinion.

"The law recognizes that it would be unrealistic to expect jurors to be free from all prejudices, a failing common to all human beings. We can only attempt to have them put

12. Appellant also alleges that: (1) the print taken from the scene of the crime was variously described as a sneaker print and a shoe print; and (2) even if granting the legality of seizing the sneaker, the seizure of the other portions of his clothing was not supported by probable cause. We believe both these contentions to be totally devoid of merit.

aside those prejudices in the performance of their duty, the determination of guilt or innocence. We therefore do not expect a tabula rosa but merely a mind sufficiently conscious of its sworn responsibility and willing to attempt to reach a decision solely on the facts presented, assiduously avoiding the influences of irrelevant facts."

*Commonwealth v. Johnson*, 452 Pa. 130, 136, 305 A.2d 5, 8 (1973).

Thus, "[t]he test of disqualification is the juror's ability and willingness to eliminate the influence of his scruples and render a verdict according to the evidence . . . ." *Commonwealth v. Bighum*, 452 Pa. 554, 560, 307 A.2d 255, 259 (1973), *quoting, Commonwealth v. Gelfi*, 282 Pa. 434, 437, 128 A. 77, 79 (1925). Moreover, this determination is to be made by the trial judge based upon the juror's answers and demeanor, and we will not reverse a judge's ruling on a challenge for cause absent a palpable abuse of discretion. *Commonwealth v. Bighum, supra.*

Mindful of this limited scope of review, we find no such abuse in the action of the trial court. During voir dire, Mrs. Smith testified that her two grandchildren were about the same age as the victim, and that her neighbor's child had been raped some two years earlier. As the following excerpts from the voir dire examination illustrate, she expressed some initial hesitation over her ability to decide the matter dispassionately:

"Q. [Assistant District Attorney] Can you put it out of your mind and decide this case on the facts of this case?
A. [Mrs. Smith]: Well, my neighbor's daughter was raped, too, so—
Q. All right.
   How long ago was that?
A. About two years ago.
Q. How old was your neighbor's daughter?
A. She was ten.
Q. Now, this case involves a rape and beating of a girl approximately nine years old.

Now, do you feel that because of the fact that your neighbor's daughter was raped, that that would in any way affect your ability to be a fair and impartial juror?

A. I think so. (Nods head affirmatively)

Q. In what way, ma'am?

A. Well, I would be thinking of my, you know, grandchildren.

Q. Well, you answered that question when the Judge asked you if you would be able to follow the law as he gave it to you?

A. (No answer)

Q. Is that correct?

A. Yes.

Q. Now, the Judge instructed you to put everything out of your mind and decide this case solely on the facts of this case alone. Would you be capable of doing that?

A. Well, to be truthful, I mean, it might be a little doubt.

Q. Well, could you follow the Judge's instructions?

A. Pardon me?

Q. Could you follow the Judge's instructions?

A. Well, I'd be a little doubtful, to be truthful.

Q. And, when you say, 'You'd be a little doubtful', can you explain in what way?

A. Well, I guess in my–if I–if I heard all the, you know, the different–I don't know; I don't know. (Shakes head negatively)

Q. Now, do you understand that witnesses will be presented in this case?

A. Yes, sir.

Q. You understand that you will have to judge those witnesses on what you hear?

A. (Nods head affirmatively) Yes, sir.

Q. And, do you feel that you would be able to judge their testimony on the basis of that alone?

A. I guess I would.

## CROSS–EXAMINATION

BY MR. HARRIS [Counsel for Appellant]:

.    .    .    .    .

Q. Because of the fact that your neighbor's daughter was raped; she was ten years old?

A. (Nods Head affirmatively)

Q. Would that in anyway influence your thinking in this case so that that would prevent you from being a fair and impartial juror?

A. Well, truthfully, I must say, I don't know.

Q. Well, do you think it might bother you that you wouldn't be able to—

A. Yes. (Nods head affirmatively)"

(N.T. Jury Selection 6–10).

Immediately following these equivocal answers, the trial judge instructed Mrs. Smith as follows:

"Q. Well, I'm asking you, can you put it out of your mind so that you can determine the guilt or innocence of this defendant based on the evidence that you hear in this courtroom as far as this case is concerned?

A. Well, I'll do my best.

Q. That's not good enough; you'll do your best. Either you can put that incident out of your mind and decide this case solely on the evidence which you hear in this court-room, or you can't.

In other words, this defendant is not the one who raped your next door neighbor's daughter. That's a separate case entirely. Can you put that out, that other case out of your mind so that you can decide his guilt or innocence solely upon the evidence you hear from this witness stand?

Either you can do it or you can't do it.

A. (Nods head affirmatively) Yes, I would.

Q. Can you do it?

A. I can, Yes."

(N.T. Jury Selection 11–12).

Mrs. Smith reiterated this belief a short time later in retort to defense counsel's question:

"BY MR. HARRIS:

Q. I ask you, again, Mrs. Smith, despite all that additional care that the Judge just gave you in enunciating the principles of law, with the fact that your neighbor was raped, would it still cause you some problems in being a fair and impartial juror in this case?

A. (Shakes head negatively) No, I don't think so.

Q. You don't think so?

A. (Shakes head negatively) No."

(N.T. Jury Selection 18).

We believe that these responses reflected Mrs. Smith's capability to set aside her personal opinions during the course of the trial. This is not a situation in which the witness was coerced into affirmative answers by the chastisement of the trial judge. Rather, the latter quite correctly sought to eliminate the hesitancy in the answer given by the witness by explaining the function of a juror. With that clarification, Mrs. Smith became certain that she could adequately comport with those requirements. We find no error in this.

■ Nor was the juror automatically barred by any possible "situational affinity" with the child victim. While certain relationships, coupled with a showing of prejudice, will serve to disqualify a prospective juror, *see Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326 (1972), a distant situational relationship between a prospective juror and the victim does not automatically result in disqualification. The cases appellant cites to contest this view are not persuasive.

In *United States ex rel. DeVita v. McCorkle*, 248 F.2d 1 (3rd Cir.), *cert. denied*, 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957), the defendant was charged with murder of a police officer committed in the course of a robbery. At the voir dire examination, the defendant's counsel sought to exclude persons who had direct or indirect robbery experience and those with a close association or relationship with personnel of law enforcement agencies. One talesman proffered no such relationship and was accepted as a juror. The

defendant was ultimately convicted, but it was later discovered that the juror did indeed know several members of the local police force. In reversing that conviction, the Third Circuit Court of Appeals noted as follows:

"The assurance of an impartial tribunal is too vital to be subjected to speculation concerning the quantum of prejudice flowing from this grossly disqualified juror. In a capital case at least counsel should be able to rely on prospective jurors answering questions with candor and not be forced to deal with each talesman as a hostile, evasive witness. This principle was especially applicable to the trial of appellant and his co–defendants the design of which was to have the jury pass on the essentially judicial question of sentence, life or death, instead of the traditional jury fact finding and determination of guilt or innocence. For that kind of trial the Fourteenth Amendment insists on the most impartial tribunal the reasonable needs of society will permit. With Kuhnle a member of it, the DeVita–Grillo jury was not that sort because 'One who has been assaulted, threatened with a deadly weapon and robbed is not likely to forget or forgive nor to treat lightly or even fairly similar conduct in others. This is a normal human reaction following customary behavior, expected and anticipated by the background of experience.' [*State v. Grillo*, 16 N.J. 103, 116, 106 A.3d 294, 300–01 (1954)]." *United States v. McCorkle, supra* at 8 (footnote omitted).

While we quite agree that a defendant should not be forced to deal with a hostile and evasive witness, such was not here the case. Mrs. Smith was honest and forthright in her answers, and upon being reminded of her duties should she be chosen as a juror, reaffirmed a commitment to adjudge the case solely on the evidence presented. The trial court, therefore, did not err in its ruling.

Appellant's final contention is that the trial court erred in overruling his demurrer to the charge of possessing an instrument of crime. While technically appellant has waived this issue by failing to rest subsequent to the adverse

ruling, we will treat his assignment as a challenge to a court order refusing a motion in arrest of judgment as to the sufficiency of the evidence. *See Commonwealth v. Cristina,* 481 Pa. 44, 391 A.2d 1307 (1978), *cert. denied,* 440 U.S. 925, 99 S.Ct. 1255, 59 L.Ed.2d 479 (1979); *Commonwealth v. Dussinger,* 478 Pa. 182, 386 A.2d 500 (1978).

■ Appellant's challenge to the possession conviction is that the objects utilized to inflict the injuries to the victim were not "instruments of crime." The victim testified that she was sitting on the edge of a mattress when the defendant apparently pushed a table which struck her in the eye inflicting severe injury. The evidence also supports an inference that appellant struck the victim with a broom handle and wiped the blood from the handle onto a blanket.

Under 18 Pa.C.S. § 907(c), an instrument of crime is

"(1) [a]nything specifically made or specially adapted for criminal use; or

(2) anything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have."

Obviously, the table and broom handle do not fall within the second category of instruments of crime since they are not "commonly used for criminal purposes," and if the conviction is to be affirmed, they must satisfy the first portion of the above definition.

In this respect, the trial court overruled the demurrer on the basis that any object used to inflict bodily injury meets the above definition because the infliction of bodily injury is itself a crime, and therefore any object used [*i. e.,* "specially adapted"] for this purpose is an instrument of crime. This tautological reasoning was rejected, however, in *Commonwealth v. Rios,* 246 Pa.Super. 479, 486, 371 A.2d 937, 940–41 (1977), in which the defendant utilized a hammer to inflict injury to the victim. In that case, we stated,

"Such an interpretation renders the definition of 'instrument of crime' completely unnecessary. The legislature might just as well have provided: 'A person commits a

misdemeanor of the first degree if he possesses *any object* with the intent to employ it criminally.' Applying this analysis, a pen would be the criminal instrument of a forger. A credit card could become a burglary tool if it were used to open a door. A rolling pin or candlestick holder could be an instrument of crime in the hands of an attacker. Our legislature did not intend to criminalize the possession of such innocent objects." (Emphasis in original).

*See Commonwealth v. Hill,* 267 Pa.Super. 140, 406 A.2d 558 (1979) (cardboard set on fire and thrown at police officer not instrument of crime); *Commonwealth v. Moore,* 261 Pa.Super. 92, 395 A.2d 1328 (1978) (stick); *Commonwealth v. Moore,* 259 Pa.Super. 560, 393 A.2d 967 (1978) (ordinary hunting knife). In the instant case, there was no evidence that the table or broom handle were "specially made or specially adapted for criminal use" and the mere employment of these devices in the perpetration of a crime does not establish that they were "specially adapted" for that purpose.

Moreover, we find appellee's reliance upon *Commonwealth v. Morgan,* 265 Pa.Super. 225, 401 A.2d 1182 (1979), to be misplaced. While appellee is correct that this court sustained a conviction in that case when the defendant utilized an instrument that had an "innocent, lawful" purpose (a pair of wirecutters) in perpetrating an offense, that conviction was sustained on the basis of the second portion of the definition of an instrument of crime since wirecutters are "commonly used for criminal purposes" as a burglary tool and were possessed by the defendant under circumstances indicating an intent to employ them in a criminal manner. Indeed, we noted, in dicta in that opinion that the instrument would have not satisfied the first portion of the definition since they were not made or adapted specially for criminal use although employed for that purpose. Because the conviction must be sustained, if at all, on the basis of the first part of the appropriate definition, appellee's reliance upon *Commonwealth v. Morgan, supra,* is unfounded.

■ Finally, because the conviction on the possession of an instrument of crime charge must be arrested, we must determine whether to remand the case to the trial court for resentencing. Generally, an appellate court will remand for resentencing when one conviction is ruled invalid if the invalid conviction "may have influenced the sentence . . . ." *Commonwealth v. Lockhart,* 223 Pa.Super. 60, 65, 296 A.2d 883, 886 (1972), *quoting, McGee v. United States,* 462 F.2d 243, 246 (2d Cir. 1972). In the instant case, the trial judge took great care to individualize the sentence on each of the counts and meticulously designated whether the sentence was to be served consecutively or concurrently with the sentences on the remaining counts. In light of the more serious nature of the remaining charges as well as the fact that the two and one–half to five year sentence on the possession of instrument charge was to be served concurrently with an identical sentence for unlawful restraint and a ten to twenty year sentence for rape, we do not believe that the sentence on the possession charge influenced the court in its formulation of sentences on the remaining valid convictions.

For the above stated reasons, the conviction for possession of an instrument of crime is vacated and the indictment quashed. The sentences on the remaining counts are affirmed.

SPAETH, J., files a concurring opinion.

SPAETH, J., concurring:

I agree with the majority's opinion except in one respect. As I read the record, Mrs. Smith all but admitted that she could not be impartial because her neighbor's ten year old daughter had been raped, and only reneged because the lower court vigorously pressed her to do so. I have a great deal of difficulty believing that Mrs. Smith could have "put aside [her] prejudices in the performance of [her] duty." *Commonwealth v. Johnson,* 452 Pa. 130, 136, 305 A.2d 5, 8 (1973). I conclude, therefore, that the lower court erred in not dismissing her for cause. However, since she was dis-

missed on a peremptory challenge, the lower court's error was harmless. *Commonwealth v. McGrew,* 375 Pa. 518, 100 A.2d 467 (1953); *Commonwealth v. Bibalo,* 375 Pa. 257, 100 A.2d 45 (1953).