J-S05040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEENAN JONES | : | |
| | : | |
| Appellant | : | No. 559 EDA 2020 |

Appeal from the Judgment of Sentence Entered January 9, 2020
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006396-2018

BEFORE: BOWES, J., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JUNE 02, 2021**

Keenan Jones appeals from his judgment of sentence imposed on numerous convictions, all stemming from a shooting spree in a Walmart. He challenges the sufficiency of the evidence to prove Attempted Murder, the trial court's admission of certain photographs into evidence, and its refusal to propound certain questions to potential jurors during *voir dire.* We affirm.

The trial court aptly summarized the evidence against Jones, viewed in the light most favorable to the Commonwealth as verdict winner,[1] as follows:

> On Tuesday, August 14, 2018, at approximately 6:00 p.m. the Cheltenham Township police department responded to the Walmart located on Easton Road in Cheltenham Township for the report of a shooting. There were numerous 9-1-1 calls for multiple people being shot within the store. Once the police arrived, they discovered five (5) victims suffering from gunshot wounds. The shooter, later identified as Appellant, Keenan Jones, fled from the

---

[1] ***See Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014).

store in a vehicle with his sister, who had accompanied him in the store.

Surveillance video from the Walmart depicted [Jones] standing in the check-out line near register number 14 with his sister. (N.T. 10/17/19 at 37). This register was the farthest register from the entrance and exit of the Walmart. (N.T. 10/17/19 at 37). Appellant and his sister appeared to be arguing based on their hand gestures and demeanor. (N.T. 10 /17/19 at 17, 30). Kevin Richards, [Jones'] first victim, was standing nearby at register number 13 and he noticed [Jones] and his sister arguing. (N.T. 10/17/19 at 12-13, 17). He then noticed that [Jones] began walking back toward the interior of the store, in Mr. Richards's direction, rather than toward the exit, which one might typically do after checking out. (N.T. 10/17/19 at 17-18, 37). [Jones] made eye contact with Mr. Richards and said to him "What are you looking at?" (N.T. 10/17/19 at 18-19, 22). [Jones] then pulled out a gun from his sister's waistband and immediately pointed it at Kevin Richards's waist. (N.T. 10/ 17 / 19 at 19-22). Without provocation, [Jones] fired his gun at Kevin Richards, striking the victim in his right calf. (N.T. 10/17/19 at 19-20, 35). Mr. Richards then ran away from [Jones], zig-zagging through the store in an attempt to find safety. (N. T. 10/17/19 at 21). The victim heard several more shots being fired. (N. T. 10/17/19 at 21).

[Jones] then headed down the "main alley" of the store toward the exit door, and encountered his second victim, Akiya Dash. (N.T. 10/17/19 at 45, 63). Ms. Dash was the customer service manager at the Walmart and was assisting a customer at the customer service desk when she first heard the gunshot that hit Kevin Richards. (N.T. 10/17/19 at 44). She described it as sounding like glass breaking coming from the area of registers 13 and 14, where the shooting occurred. (N.T. 10/17/19 at 44). She walked toward that location, and heard people running and screaming. (N.T. 10/17/19 at 44). When she looked up, she saw [Jones] running toward her and pointing his gun at her. (N.T. 10/17/19 at 44-45, 51-52, 61). He locked eyes with her, raised his gun, aimed and shot her. (N.T. 10/17/19 at 46-47, 10/18/19 at 46-47). He fired multiple shots in rapid succession. (N.T. 10/17/19 at 61; 10/18/19 at 51, 55). The surveillance video from the Walmart depicted [Jones'] arm pointed directly at Ms. Dash's chest and torso area, vital parts of the victim's body. (N.T. 10/18/19 at 45, 49). Ms. Dash heard six (6) quick shots. Although [Jones] aimed at the victim's torso area, the shots struck Ms. Dash

in her leg. (N.T. 10/18/19 at 50-51). She suffered four (4) gunshot wounds to her leg. (N.T. 10/17/19 at 89). One of the bullets lacerated an artery in her ankle and caused life threatening bleeding. (N.T. 10/17/19 at 89-90).

This shooting spree directed at Ms. Dash also injured three additional victims who were nearby, Naomi Young, Dominique Adams, and Tanya Plunkett. All five (5) victims testified at trial about this crime. They explained the fear they experienced while the shooting rampage was occurring, the physical pain they experienced from their injuries and, for some, the on-going pain and trauma they experience.

After the shooting spree, [Jones] fled the store, concealed amongst hoards of people escaping the scene of the shooting and running towards safety. He and his sister got into her car and fled the scene. (N.T. 10/17/19 at 124-128). A concerned citizen, unaware of the shooting that had just occurred, reported seeing [Jones] at the intersection of Cheltenham Avenue and Mt. Pleasant Avenue, calmly and deliberately, discarding a handgun along the highway divider in the roadway. (N.T. 10/17/19 at 146, 148, 151-152, 156, 161). After discarding the handgun, [Jones] got back in his vehicle and fled into Philadelphia, eventually rear[-]ending an unoccupied Philadelphia police cruiser in the area of Sedgwick and Forrest [A]venues. (N.T. 10/17/19 at 184, 189, 225-226).

Two Philadelphia police officers observed the vehicle accident. Following the accident [Jones] began running, and the officers engaged in a foot pursuit in an attempt to detain him. (N.T. 10/17/19 at 184, 190-192, 230-232). [Jones] resisted and engaged in a struggle with the two officers causing injury, including a broken wrist, injured jaw, and sprained ankle. (N.T. 10/17/19 at 191-198, 233-234). Other officers arrived on scene and [Jones] was taken into custody. (N.T. 10/17/19 at 235-236).

Officers later recovered the firearm Appellant discarded on the road. The magazine and chamber were both empty, indicating all rounds had been fired. (N.T. 10/17/19 at 179-180).

Pa.R.A.P. 1925(a) Op., filed 5/7/20, at 2-5 (footnotes omitted).

Prior to trial, Jones filed a motion *in limine* to exclude photographs taken

at the scene that showed blood on the floor after the shooting. Motion *in*

*Limine*, filed 10/11/19. He argued that the photos were "startling and inflammatory." *Id.* at ¶ 54. Following argument from both parties, the trial court denied the motion concluding that the photos were not inflammatory.

> I've looked at the two photographs that are subject to dispute. Again, in a case of this nature, this [c]ourt does not find them to be inflammatory. There is blood that is displayed on the floor of both, but in the context of the larger photograph which is in both cases, a larger view of the Walmart store, the blood does not take up a significant portion of the images. The [c]ourt does not find these images particularly jarring or startling. They are exactly the kind of images one would expect in a case like this. So I will admit them in evidence. I will also say to the extent that some [c]ourt in the future might look at those photographs and find that they are inflammatory, I do find that they have such essential evidentiary value that their probative value significantly outweighs any potential for prejudice. So I think it's appropriate for the jury to see those images.

N.T., 10/16/19, at 30.

Jones proceeded by way of a jury trial and during *voir dire*, he proposed asking the following questions to members of the jury pool:

> 3. The defense does not dispute that Keenan Jones committed the act of shooting a firearm and causing injury to several people. Rather, the defense intends to present evidence that Mr. Jones suffered a psychotic break at the time of the shooting and that he therefore did not appreciate the wrongfulness of his conduct. In the law, this is called the defense of insanity. Do you have any preformed opinions about an insanity defense that would prevent you from fairly and impartially considering the evidence in this case?

> 4. Could you find Mr. Jones not guilty by reason of insanity if the evidence supports such a verdict?

Pa.R.A.P. 1925(a) Op. at 17.

- 4 -

The trial court denied Jones' request, stating that the questions "go far beyond determining whether jurors have preconceived ideas and can consider the evidence fairly[.]" N.T., 10/15/19, at 30. It also concluded that asking the jurors a question about the defense of insanity without telling them the law regarding the defense would be improper. *See id.*

> THE COURT: . . . But in looking at proposed *voir dire* questions 3 and 4 that relate specifically to the defense of insanity, I find that those questions are improper as they are written. They go far beyond determining whether jurors have preconceived ideas and can consider the evidence fairly and they seek -- they misstate the law and they ask the Court to ask questions of the prospective jurors without telling them what the law is which I think would be improper.

*Id.*

At trial, before the jury saw the photographs that were the subject of the motion *in limine*, the trial court gave the following cautionary instruction:

> THE COURT: Ladies and gentlemen, the next two photographs after this are going to be shown to you to show the condition of the scene after the crime and to help you understand the testimony of other witnesses. They're not pleasant photographs to look at. And I just want to caution you right now, please don't let those photographs stir up your emotions to the prejudice of this defendant. Your verdict must be based on rational and fair consideration of all the evidence and not on passion or on prejudice against the defendant, the Commonwealth, or anyone else. So I just give you that caution before we show you these next two photographs.

*Id.* at 104.

The jury found Jones guilty of numerous crimes: Attempted Murder, 14 counts of Aggravated Assault, 20 counts of Recklessly Endangering Another

Person, and one count each of Possession of an Instrument of Crime, Persons not to Possess Firearms, Firearms not to be Carried Without a License, and Resisting Arrest.[2] The trial court imposed an aggregate sentence of 25 to 62 years' incarceration. This timely appeal followed.

Jones raises the following issues:

1. Was there insufficient evidence to sustain the conviction of attempted-murder beyond a reasonable doubt when [Jones] hit non-vital parts of Akiya Dash's body and the video does not show him pointing at her torso, a vital body [part]?

2. Did the trial court err by allowing the photo of a pool of blood on the Walmart sales floor because it was cumulative, inflammatory and not necessary to prove anything at issue?

3. Did the trial court err in not asking potential jurors the Defense's proposed questions number "3" and "4" which mentioned the possibility of being open to a verdict of guilty but insane in deliberations after trial?

Jones' Br. at 3-4 (suggested answers omitted).

Jones maintains that there was insufficient evidence to support his conviction for attempted murder because it did not show "that [Jones] took a substantial step towards specifically killing Ms. Dash." *Id.* at 9. He notes that the victim's injuries were to her leg, which he maintains is not a vital part of the body. *See id.* Though Jones concedes that there was expert testimony that he aimed at the victim's torso, he argues that the expert's testimony in this regard was improper because the video "does not show [him] aiming at

_____

[2] 18 Pa.C.S.A. §§ 901(a); 2702(a)(1), (2), (3), and (4); 2705; 907; 6105(a)(1); 6106(a)(1); and 5104, respectively.

- 6 -

the torso the way in which the expert witness concludes as-a-matter-of-fact [sic]." *Id.*

Our standard of review for a claim challenging the sufficiency of the evidence is *de novo*. **Rushing**, 99 A.3d at 420. When we consider such a claim, we view the evidence in the light most favorable to the Commonwealth as verdict winner, with all reasonable inferences arising therefrom. *Id.* at 420-21. We consider the entire trial record and all evidence received below. **Commonwealth v. Reed**, 990 A.2d 1158, 1161 (Pa. 2010).

Criminal attempt occurs when, with intent to commit a specific crime, a person commits any act that constitutes a substantial step toward the commission of that crime. 18 Pa.C.S.A. § 901(a). Under this standard, to establish attempted murder, the Commonwealth must prove beyond a reasonable doubt that the defendant took "a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act." **Commonwealth v. Dale**, 836 A.2d 150, 153 (Pa.Super. 2003) (citation omitted). Specific intent to kill may be inferred from evidence that the defendant used a deadly weapon on a vital part of the victim's body. *Id.*

Jones' argument conflates the elements of attempted murder. He claims that because the victim sustained injuries to the leg, which Jones argues is not a vital part of the body, the evidence was insufficient to prove that he took a substantial step toward killing the victim. That argument mixes the rule that specific intent may be found from evidence that the defendant used a deadly

weapon on a vital bodily part, with the requirement that the prosecution prove that the defendant took a substantial step toward committing the killing.

Jones' main argument appears to go to the finding that he took a substantial step toward committing murder. That argument is meritless. There was evidence that as he ran toward Akiya Dash, he pointed a gun at her, locked eyes with her, took aim, and fired. This was enough. *See* *Commonwealth v. Jackson*, 955 A.2d 441, 445 (Pa.Super. 2008) (finding substantial step toward committing murder where defendant who was shooting at a third person, turned, looked at police officer, and raised his arm toward the officer).

His challenge to the finding of specific intent also fails. He acknowledges that at trial, an expert in the use of firearms and marksmanship, Corporal Steve Morrisey, testified that after viewing the surveillance video, he was of the expert opinion that when Jones shot Dash, he was aiming at her torso. *See* N.T., 10/18/19, at 18, 45, 49. Jones contends that we should disregard Corporal Morrisey's testimony because, in Jones' view, the video "plainly" does not corroborate Corporal Morrisey's testimony. Jones' Br. at 9. He also argues that because the gunshots struck the victim "in the leg and nowhere else," the evidence does not support a finding of specific intent. *Id.*

These arguments miss the mark. Our standard of review for sufficiency challenges requires us to consider everything received in evidence below, and to view it in the light most favorable to the Commonwealth as verdict-winner. *See Rushing*, 99 A.3d at 420-21; *Reed*, 990 A.2d at 1161. Corporal

Morrisey's and Akiya Dash's testimony was in evidence, and viewed in the Commonwealth's favor, established that Jones directed his gun at a vital part of the victim's body, her torso, and fired. The claim of a contradiction between Corporal Morrisey's testimony and the video goes to weight, not sufficiency. Jones's sufficiency challenge fails.

Jones next challenges the admission into evidence of the photos[3] depicting blood. He argues they were inflammatory. Jones maintains that they "served no purpose, and [were] unnecessary as it tended to prove no element and was neither [sic] cumulative of the five witnesses who described the events and their injuries." Jones' Br. at 11.

Jones waived this question. The photographs are not in the certified record. "As an appellate court, our review is limited by the contents of the certified record." *Commonwealth v. Manley*, 985 A.2d 256, 263 (Pa.Super. 2009) (citing Pa.R.A.P. 1921). As such, it is impossible for us to determine whether the photographs were inflammatory, and if they were, whether their evidentiary value outweighs the likelihood of inflaming jurors' passions. As the appellant, Jones was responsible for ensuring that the certified record contained everything necessary for us to perform our job. *Id.* ("A failure by

_____

[3] It is not clear if Jones challenges one or both photos that apparently were the subject of his motion *in limine.* He at times in his brief uses the plural in his discussion of this issue – *see* Jones' Br. at 10 ("admission of these pictures") – and at others, he uses the singular – *see id.* ("the photo is inflammatory"). This point of confusion is immaterial because we find waiver due to both photos' absence from the certified record. We use the plural for convenience.

[A]ppellant to [e]nsure that the original record certified for appeal contains sufficient information to conduct a proper review constitutes waiver of the issue sought to be examined") (quoting **Commonwealth v. Martz**, 926 A.2d 514, 525 (Pa.Super. 2007)). Having failed in that duty insofar as the record does not contain the photos in question, he has waived review of this issue.

Jones also argues that the trial court erred in denying his request for two questions during *voir dire* regarding potential jurors' attitudes on the insanity defense and verdict of guilty but mentally ill. He acknowledges existing case law – including from the Pennsylvania Supreme Court – "upholding the denial of *voir dire* questions proposed to gauge jurors' attitudes toward insanity defenses and psychiatric testimony." Jones' Br. at 11 (citing **Commonwealth v. Johnson**, 305 A.2d 5 (Pa. 1973); **Commonwealth v. Biebighauser**, 300 A.2d 70 (Pa. 1973); and **Commonwealth v. Hathaway**, 500 A. 2d 443 (Pa.Super. 1982)). He asks us to reconsider such precedents in view of **Kahler v. Kansas**, 140 S.Ct. 1021 (2020)**.**

This issue is meritless. As a three-judge panel of the Superior Court, we are in no position to overrule any decision of our own Court, much less of the Pennsylvania Supreme Court. Nor does the U.S. Supreme Court's decision in **Kahler** enable us to ignore the precedents Jones cites. The holding of **Kahler** was limited to a determination that the Due Process Clause of the Fourteenth Amendment does not require "the acquittal of any defendant who, because of mental illness, could not tell right from wrong when committing his crime." **Id.** at 1025. That holding has no bearing on the issue at hand.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/2/2021*