639 A.2d 798

**In the Interest of K.B.**

**Appeal of K.B.**

Superior Court of Pennsylvania.

Submitted May 24, 1993.

Filed Feb. 16, 1994.

Reargument Denied April 25, 1994.

John W. Packel, Asst. Public Defender, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Com., participating party.

Before ROWLEY, President Judge, and CIRILLO and BROSKY, JJ.

CIRILLO, Judge:

K.B., a sixteen year-old juvenile, appeals from an order of the Court of Common Pleas of Philadelphia County adjudicating him delinquent and placing him on temporary intensive drug and alcohol probation, pending a further review in 60 days. We quash the appeal as interlocutory.

On November 8, 1992, Officer Nathaniel Hartley received a radio call that a group of males were gambling and engaged in disorderly conduct on a highway in the vicinity of 2200 West Indiana Avenue in Philadelphia. Upon arriving at the scene, Officer Hartley observed K.B. and four other males shooting dice for money. Officer Hartley ordered the group to disperse and the young men complied.

Approximately thirty minutes later, Officer Hartley returned to the scene and observed that the young men had resumed their gambling activities. At this point, Officer Hartley testified that he "was going to arrest the defendant [K.B.] and one other male for disorderly conduct." Instead of making the arrests, however, Officer Hartley conducted "pat down" searches to ensure that none of the youths were armed.[1] Upon patting down K.B.'s pants, Officer Hartley felt an unknown blunt instrument. Fearing that it could be a weapon, he reached into K.B.'s pocket and withdrew a comb and ten vials of crack cocaine. Officer Hartley placed K.B.

---

1. Officer Hartley's testimony regarding the reason for the "pat-down" searches is somewhat inconsistent. On direct examination, he testified that he searched the males for his safety because he was by himself. On cross-examination, however, Officer Hartley testified that although he feared for his safety, he had no specific information that any of the youths were armed.

under arrest for knowing and intentional possession of a controlled substance. Officer Hartley did not arrest K.B. for failure to disperse [2] or for disorderly conduct.[3]

K.B. filed a motion to suppress the vials of crack cocaine found on his person. The suppression court denied this motion. The case proceeded to a delinquency hearing before the Honorable Sheldin C. Jelin. After reviewing testimony from Officer Hartley, testimony from K.B.'s guardian Alma Irby, and testimony regarding K.B.'s scholastic record,[4] Judge Jelin adjudged K.B. delinquent and placed him on temporary intensive drug and alcohol probation, pending a final review in 60 days. Significantly, Judge Jelin did not impose a final disposition. He opted instead for a temporary one, in order to more properly determine the course of treatment and rehabilitation for the young offender. This appeal followed.

On appeal, K.B. claims that Judge Jelin erred in denying his motion to suppress the seized crack cocaine. Specifically, K.B. alleges that Officer Hartley's search was neither a proper *Terry* stop,[5] nor a valid search incident to a lawful arrest.[6]

2. 18 Pa.C.S. § 5502 states: "Where three or more persons are participating in a course of disorderly conduct which causes or may reasonably be expected to cause substantial harm or serious inconvenience, annoyance or alarm, a peace officer or other public servant ... may order the participants and others in the immediate vicinity to disperse. A person who refuses or knowingly fails to obey such an order commits a misdemeanor of the second degree."

3. 18 Pa.C.S. § 5503 states: "A person is guilty of disorderly conduct if, with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: ... (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor. An offense under this section is a misdemeanor of the third degree ... if he persists in disorderly conduct after reasonable warning or request to desist."

4. K.B.'s school records indicate that he has missed 31 out of a possible 56 days of school this year and 156 out of a possible 181 days of school last year.

5. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the United States Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons...." *Id.* at 30, 88 S.Ct. at 1884–85.

6. It is well settled that "in all cases of lawful arrests, police may fully search the person incident to the arrest." *Commonwealth v. Williams,*

For the reasons that follow, we quash this appeal as interlocutory.

■ As a general rule, this court will only permit appeals from final orders, unless we are otherwise empowered by statute or rule of court. *Grove North America v. Arrow Lift,* 421 Pa.Super. 12, 17, 617 A.2d 369, 371 (1992); *see* Pa.R.A.P. 341. "In ascertaining what is a final appealable order, this court must look beyond the technical effect of the adjudication to its practical ramifications." *Id.* at 17, 617 A.2d at 372. A "final order" is one which either terminates the litigation or otherwise disposes of the entire case. *Commonwealth v. VanBuskirk,* 303 Pa.Super. 148, 149, 449 A.2d 621, 622 (1982). Thus, an order is considered interlocutory and not final, if it does not effectively put the litigant out of court. *Id.*

■ Furthermore, in juvenile proceedings we have consistently held that an order is interlocutory until a final disposition has been made and the proper form of treatment, rehabilitation, and supervision has been determined. *Id.* at 150, 449 A.2d at 624; *See Commonwealth v. Kiker,* 289 Pa.Super. 188, 432 A.2d 1115 (1981) (finding that an order transferring a minor, who was adjudged delinquent, to a different county for further disposition was not final, and, thus, not appealable); *In the Interest of C.A.M.,* 264 Pa.Super. 300, 399 A.2d 786 (1979) (holding that an appeal after a finding of dependency, but before a final disposition, was interlocutory and unappealable).

■ In the case at hand, Judge Jelin's issuance of intensive drug and alcohol probation with a further hearing in 60 days is not a final, appealable order. It does not terminate the

390 Pa.Super. 493, 497, 568 A.2d 1281, 1283 (1990); *see Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979); *Chimel v. California,* 395 U.S. 752, 756, 89 S.Ct. 2034, 2036, 23 L.Ed.2d 685 (1969); *Commonwealth v. Long,* 489 Pa. 369, 374, 414 A.2d 113, 115 (1980).

litigation and put K.B. out of court; on the contrary, it simply delays the final disposition so that Judge Jelin can more properly determine whether K.B. has returned to school, stopped his illicit gambling activities, and refrained from taking drugs.[7] Accordingly, we quash K.B.'s appeal as interlocutory.

Despite our ruling, however, we think it important to pause and address the disturbing implications inherent within K.B.'s appeal to this court. Today, K.B. asks this court to reverse Judge Jelin's finding of delinquency, solely because K.B. claims that the search and subsequent seizure of crack cocaine found on his person was in violation of the Fourth Amendment. In essence, therefore, K.B. seeks refuge from being adjudged delinquent behind the shield of the Constitution of the United States.

Such an argument, unfortunately, does not present a novel proposition. All too often we are asked to provide juveniles with the full range of rights granted to the adult criminal defendant, while simultaneously retaining their status as juvenile offenders. We think this approach rather schizophrenic and in need of fundamental reevaluation.

Born at the end of the 19th century,[8] the juvenile justice system was created with the lofty goal of saving, not punishing, of rehabilitating, not incarcerating, and of protecting, not penalizing our wayward children.[9] Its birth sprang from the efforts of social reformers, who were concerned with the

7. Judge Jelin's intentions were made clear by his final comments to K.B: "You'll be back in court at that time (60 days later). And I'm telling you, young man, if there's any further involvement with the juvenile system, you don't have anything good on your background, school absences, gambling, and everything else. So if you want to stay out on the street, my suggestion is you get an education." Adjudicatory Hearing at 34.

8. The first juvenile court was established in Illinois in 1899. Within a short span of years, every jurisdiction in America had some form of juvenile court system. *See In re Gault*, 387 U.S. 1, 14, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967); Comment, *The Supreme Court and Pretrial Detention of Juveniles: A Principled Solution to a Due Process Dilemma*, 132 U.Pa.L.Rev. 95, 98 (1983).

9. *See* Claudia Worrell, *Pretrial Detention of Juveniles: Denial of Equal Protection Masked by the Parens Patriae Doctrine*, 95 Yale L.J. 174, 176

deleterious effects of sentencing juveniles to lengthy terms in adult prisons.[10] The juvenile courts "aimed to check juvenile delinquency and to throw around a child, just starting, perhaps, on an evil course and deprived of parental care, the strong arm of the State acting as *parens patriae*."[11] *In re Holmes*, 379 Pa. 599, 603, 109 A.2d 523, 525 (1954).

To effectuate these laudable goals, juvenile hearings became non-adversarial, informal proceedings, where the strict rules of evidence and procedure were relaxed and in which the judge could analyze the child's needs and fashion the best possible remedy. Because the hearings did not result in criminal convictions and inured to the benefit of the juvenile, the child did not receive the full panoply of constitutional and procedural rights of his adult counterpart.[12] While adults

(1985). *See also Schall v. Martin*, 467 U.S. 253, 263–66, 104 S.Ct. 2403, 2409–11, 81 L.Ed.2d 207 (1984); *McKeiver v. Pennsylvania*, 403 U.S. 528, 550, 91 S.Ct. 1976, 1988, 29 L.Ed.2d 647 (1971); *In re Winship*, 397 U.S. 358, 376–77, 90 S.Ct. 1068, 1079, 25 L.Ed.2d 368 (1970); *In re Gault*, 387 U.S. at 15–16, 87 S.Ct. at 1437; *Kent v. United States*, 383 U.S. 541, 554–55, 86 S.Ct. 1045, 1053–54, 16 L.Ed.2d 84 (1966); *In re Holmes*, 379 Pa. 599, 603, 109 A.2d 523, 525 (1954); *Commonwealth v. Rudd*, 366 Pa.Super. 473, 478, 531 A.2d 515, 518 (1987).

10. *In re Gault*, 387 U.S. at 14, 87 S.Ct. at 1436. Studies indicate that even a relatively short period of imprisonment in adult facilities can cause a juvenile severe and irreparable damage. The suicide rate among juvenile inmates is five times higher than youths in the general population and eight times higher than youths committed to juvenile rehabilitation centers. Furthermore, the hostile environment, poor sanitation, and lack of privacy manifest intense feelings of fear and anxiety within the juvenile. Additionally, juveniles are frequent victims of physical and sexual assault by adult members of the prison population. Kristina H. Chung, *Kids Behind Bars: The Legality of Incarcerating Juveniles in Adult Jails*, 66 Ind.L.J. 1001, 1006 (1991).

11. *"Parens patriae*, literally 'parent of the country,' refers traditionally to the role of the state as sovereign and guardian of persons under a legal disability to act for themselves such as juveniles, the insane, or the unknown. The doctrine originated in the ancient duty of the English sovereign to protect all children within his or her realm...." Claudia Worrell, *supra* note 9, at 176.

12. Prior to the late 1960's, juveniles were entitled only to the fundamental due process right of fair treatment and were frequently denied such rights as: 1) bail; 2) indictment by a grand jury; 3) speedy and public trials; 4) trial by jury; 5) immunity against self-incrimination; 6)

enjoyed the full protection of due process of law, they also faced the grave consequence of criminal conviction and incarceration.

After three quarters of a century of continued application of these principles, the United States Supreme Court set into motion a process of reassessment and reevaluation of the juvenile system. This process, destined to continue into the present, would consist of a struggle to find a happy medium between a juvenile system capable of realizing the goals of rehabilitation and protection, and a juvenile system that would respect and not abrogate the juvenile's fundamental constitutional right of due process.

The genesis of this struggle began with *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). In *Kent,* the petitioner, a 16 year-old male, was apprehended and charged with the commission of a rape. Some time later, a juvenile court judge, without holding a hearing, obtaining records, or reciting reasons for his decision, waived jurisdiction and transferred the case to the United States District Court for the District of Columbia. *Id.* 383 U.S. at 546, 86 S.Ct. at 1049. Following a jury trial, the petitioner was found guilty and sentenced to 30 to 90 years imprisonment.

On appeal, the petitioner argued, *inter alia,* that the procedures governing the waiver of jurisdiction of juvenile matters were unsound and inappropriate, claiming that juveniles were entitled to the same constitutional guarantees as similarly situated adults.[13] *Id.* at 556, 86 S.Ct. at 1054. Justice Fortas began his majority opinion for the Court by describing the traditional role and function of the juvenile justice system. He wrote:

> confrontation of adverse witnesses; and in some cases 7) representation by counsel. *Kent,* 383 U.S. at 555, 86 S.Ct. at 1054.

**13.** In essence, the petitioner claimed that the disparity between the maximum term of five years in a juvenile detention center and the maximum sentence of life imprisonment in the adult system, required that the juvenile court must hold a hearing that comports with the requirements of due process before waiving jurisdiction over the juvenile.

The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt, and punishment. The State is parens patriae rather than prosecuting attorney and judge.

*Id.* at 554–55, 86 S.Ct. at 1054. The Court continued, however, to voice serious concerns as to the actual performance of the juvenile courts. For the first time, the Supreme Court called into question the efficacy of the system and openly expressed concerns "that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." *Id.* at 556, 86 S.Ct. at 1054. Despite these new found concerns, the Court in the end deftly avoided the broader constitutional implications of the case, holding instead that the juvenile court failed to follow proper statutory procedure and remanded the case for a waiver hearing before the juvenile court.

The Court's reluctance to consider the due process concerns of juveniles, however, would come to an abrupt end with its decision in the landmark case of *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In *Gault*, a fifteen year-old boy was adjudged delinquent for making lewd telephone calls and was committed to an industrial school for approximately five years until he reached the age of majority. *Id.* at 7–8, 87 S.Ct. at 1433. The corresponding penalty for an adult offender, however, was a fine ranging from five to fifty dollars or a maximum term of two months' imprisonment.

On appeal, the Supreme Court was asked to consider whether juvenile offenders enjoyed the same rights of due process of law as adult offenders. The Court began its analysis by reviewing the history of the juvenile justice system. During this discussion, the Court set forth the traditional justifications for relaxing constitutional protections for children; namely, that juvenile hearings were neither adversarial, nor criminal, that the child was to be treated and rehabilitated, not incar-

cerated and punished, and that, because the State was acting in its role as *parens patriae*, the juvenile has a right "not to liberty but to custody." *Id.* at 14–17, 87 S.Ct. at 1436–38.

The Court continued, however, to announce that despite the noble and benign purposes behind the juvenile system, the reality of the system decried the need for enhanced procedural safeguards. The Court found that instead of providing for flexible proceedings in which a juvenile court judge could fashion "careful, compassionate, individualized treatment," the lack of procedural safeguards was producing arbitrary and capricious rulings. *Id.* 387 U.S. at 18, 87 S.Ct. at 1439.

Specifically, the Court found that the reality of juvenile confinement and treatment facilities echoed that of their adult counterparts. It matters not, the Court reasoned, however euphemistically one titles juvenile rehabilitation centers, the child's world "becomes a building with whitewashed walls, regimented routine, and institutional hours. Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and delinquents confined with him for anything from waywardness to rape and homicide." *Id.* at 27, 87 S.Ct. at 1443 (citations omitted). Thus, it would be extraordinary, the Court concluded, if given the realities of the juvenile process, the "Constitution did not require the procedural regularity and exercise of care implied in the phrase 'due process.'" *Id.* at 27–28, 87 S.Ct. at 1444.

Consequently, the Court stated that although juvenile proceedings need not measure up to all the requirements of a criminal trial, they must at the least "measure up to the essentials of due process and fair treatment." *Id.* at 30, 87 S.Ct. at 1445. The Court announced, therefore, that juveniles are entitled to written notice of the charges against them, the right to counsel, the right to confront and cross-examine witnesses, and the privilege against self-incrimination.

The Court's decision in *Gault* would forever change the way in which the procedural process of the juvenile justice system would be evaluated. Instead of following the traditional course of simply endorsing the flexible and informal frame-

work of juvenile hearings, the Supreme Court in subsequent cases would balance the specific procedural right in question against its impact on the delinquency process. In so doing, the Supreme Court would use the degree of impairment to the juvenile system as a yardstick in determining whether to advance such rights to juveniles. In this manner, the Court would fundamentally reshape the procedural aspects of the juvenile justice system.

The first such instance was *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In *Winship*, the Supreme Court was asked to consider whether, under *Gault*, "proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' ... when a juvenile is charged with an act which would constitute a crime if committed by an adult." *Id.* at 359, 90 S.Ct. at 1070. The traditional standard of proof in juvenile hearings had been the lesser "preponderance of the evidence" standard.

Before reaching a decision, the Court first examined the effect such a standard of proof would have upon the "beneficial aspects of the juvenile process." *Id.* at 366, 90 S.Ct. at 1073. In determining that the "reasonable doubt" standard should be extended to juveniles, the Court stated:

> Use of the reasonable-doubt standard ... will not disturb New York's policies that a finding that a child has violated a criminal law does not constitute a criminal conviction, that such a finding does not deprive the child of his civil rights, and that juvenile proceedings are confidential. Nor will there be any effect on the informality, flexibility, or speed of the hearings at which the fact finding takes place. And the opportunity during the post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history and for his individualized treatment will remain unimpaired. Similarly, there will be no effect on the procedures distinctive to juvenile proceedings that are employed prior to the adjudicatory hearing.

*Id.* at 366–67, 90 S.Ct. at 1074.

Subsequently, in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Supreme Court

considered whether juveniles were constitutionally entitled to a trial by jury. Instead of "taking the easy way out with a flat holding that all rights constitutionally assured for the adult are to be imposed upon the state juvenile proceeding," *id.* at 545, 91 S.Ct. at 1986, the Court once again balanced the unique characteristics of the juvenile justice system with the juvenile's interest in a trial by jury. In declining to extend the right of a trial by jury to juvenile proceedings, the Court reasoned that the benefits of procedural orderliness were far outweighed by the existing system of intimate, informal, protective proceedings. *Id.*

Next, in *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the Supreme Court reviewed whether the Double Jeopardy Clause of the Fifth Amendment applied in the context of juvenile proceedings. Specifically, the Court considered whether a 17 year-old, after being adjudged delinquent but unfit for treatment as a juvenile, could subsequently be prosecuted as an adult for the same offenses which justified the initial finding of delinquency. In determining that juveniles are entitled to the protection against being placed in "double jeopardy," [14] the Supreme Court was ever cognizant of the potential negative effects its decision would have upon the juvenile system. The Court concluded, however, that it did not believe that extending to juveniles "the constitutional protection against multiple trials [would] diminish flexibility and informality to the extent that those qualities relate uniquely to the goals of the juvenile system." *Id.* at 535, 95 S.Ct. at 1789.

Finally, in *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), the Supreme Court considered whether pre-trial detentions of juveniles offended the Due Process Clause of the Fourteenth Amendment. The Supreme Court initially stated that the "Constitution does not mandate elimination of all differences in the treatment of juveniles." *Id.* at 263, 104 S.Ct. at 2409. The Court then indicated that, based

**14.** The Supreme Court's ruling required the juvenile court to determine whether a juvenile should be treated as an adult prior to the holding of an adjudicatory hearing.

on the State's *parens patriae* interest in preserving the welfare of its children, it must attempt to strike a balance between the flexibility and informality of the juvenile system and "yet ensure that such proceedings comport with the fundamental fairness demanded by the Due Process Clause." *Id.* Thus, the Court had to decide whether, within the context of the juvenile system, "the combined interest in protecting both the community and the juvenile himself from the consequences of future criminal conduct is sufficient" to outweigh the juvenile's substantial interest in freedom from institutional constraints. *Id.* at 264–65, 104 S.Ct. at 2409–10. In concluding that the balance weighed in favor of the state's interest, the court held that:

> [T]he juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child. . . .
> Society has a legitimate interest in protecting a juvenile from the consequences of his criminal activity—both from potential physical injury which may be suffered when a victim fights back or a policeman attempts to make an arrest and from the downward spiral of criminal activity into which peer pressure may lead the child.

*Id.* at 265–66, 104 S.Ct. at 2410–11 (citations omitted).

Placed within this historical context, it is not surprising that in recodifying the juvenile act of this Commonwealth, 42 Pa.C.S.A. §§ 6301 *et seq* (1976) (amended 1978) (hereinafter "Juvenile Act"), our legislature struggled to maintain a careful balance between a juvenile system that would promote the traditional goals of rehabilitation and protection, while simultaneously respecting the due process boundaries set by the Supreme Court.

The Juvenile Act creates a comprehensive framework in which the juvenile courts can operate fairly, yet with a degree of flexibility and informality. Among its express purposes is "to remove from children committing delinquent acts the consequences of criminal behavior, and to substitute therefor a program of supervision, care, and rehabilitation." 42 Pa. C.S.A. § 6301(b)(2).

Under the Juvenile Act, delinquency proceedings commence after a child has been "taken into custody" by law enforcement officers.[15] 42 Pa.C.S.A. § 6324. The proceedings are comprised of two distinct phases: the adjudicatory and the dispositional. The adjudicatory phase begins with the submission of a "petition" submitted on behalf of the Commonwealth. 42 Pa.C.S.A. § 6334. This petition must set forth facts which establish why the juvenile is before the court and include a statement "that it is in the best interest of the child and the public that the proceeding be brought and ... that the child is in need of treatment, supervision, or rehabilitation." *Id.*

The case then proceeds to an adjudicatory hearing before a juvenile court judge. The hearing is conducted without a jury in an informal, yet orderly manner. 42 Pa.C.S.A. § 6336(a). The hearing's purpose is to determine whether the child is delinquent; that is, whether sufficient evidence has been adduced which shows that the child committed the delinquent acts.[16] 42 Pa.C.S.A. § 6341(a). If, after reviewing the evidence presented by the petition and at the hearing, the juvenile court finds beyond a reasonable doubt that the child committed the delinquent act(s), it shall adjudge the juvenile, delinquent. 42 Pa.C.S.A. § 6341(b).

Once the juvenile is adjudged delinquent, the case advances to the dispositional phase of the proceedings. The purpose of the dispositional hearing is to determine whether the child is in "need of treatment, supervision, or rehabilitation...." *Id.* To this end, the juvenile court is empowered to review "all

**15.** The Juvenile act provides:

A child may be taken into custody:
    (1) Pursuant to an order of the court under this chapter.
    (2) Pursuant to the laws of arrest.
    (3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that removal is necessary.
42 Pa.C.S.A. § 6324(1)–(3)

**16.** The Juvenile Act defines a "delinquent act" as "an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under Federal law, or under local ordinance." 42 Pa.C.S.A. § 6302.

evidence helpful in determining the questions presented" including oral and written "social reports." 42 Pa.C.S.A. § 6341(d). After reviewing this evidence, the juvenile court may impose a dispositional order calculated to provide the juvenile with a form of care and treatment for his individualized problems. 42 Pa.C.S.A. § 6351(a). Such dispositions include, *inter alia:* 1) placing the child on an appropriate form of probation; 2) committing the child to an institution, youth development center or other facility for delinquent children; 3) ordering the child to pay reasonable fines, costs, or restitution; and 4) ordering the child to participate in a program of service or education, which is acceptable to the victim of his/her offenses. 42 Pa.C.S.A. § 6352.

Despite the informality of the proceedings and the flexibility afforded to the juvenile courts in fashioning treatment for the young offenders, the legislature of this Commonwealth built into the Juvenile Act, procedures which comported with the requirements of due process, as set forth by the United States Supreme Court. Roughly following the standards announced in *Gault* and its progeny, the Juvenile Act provides children with: the right to counsel;[17] the right to cross-examine and confront adverse witnesses; freedom from self-incrimination;[18] and the "beyond a reasonable doubt" burden of proof.[19]

Thus, the legislature, in enacting the Juvenile Act, appeared to have successfully balanced the competing interests of the Commonwealth's in rehabilitating and protecting its wayward

17. 42 Pa.C.S.A. § 6337. This section provides the right to representation at all stages of the proceedings and requires the court to furnish counsel if the juvenile does not have the financial resources to employ counsel himself. 42 Pa.C.S.A. § 6337 (Official Comment 1976) (citing *Kent*, 383 U.S. 541, 86 S.Ct. 1045 (1966) and *Gault*, 387 U.S. 1, 87 S.Ct. 1428 (1967)).

18. 42 Pa.C.S.A. § 6338. "The provisions against self-incrimination and the right to cross-examine adverse witnesses are required by *Gault, supra*." 42 Pa.C.S.A. § 6338 (Official Comment 1976).

19. 42 Pa.C.S.A. § 6341. The requirement of proof beyond a "reasonable doubt" marked a significant change from the earlier standard of "sufficient competent evidence" announced in *In re Holmes*, 379 Pa. 599, 606, 109 A.2d 523, 526 (1954), and reflects the standard announced in *Winship, supra*. 42 Pa.C.S.A. § 6341 (Official Comment 1976).

youths, and the juvenile's in receiving the protection of due process of laws. By its very terms, upon a finding of delinquency, the juvenile is not "branded" with the stigma of a criminal conviction, but is simply "adjudged delinquent." The juvenile is not sentenced to lengthy terms in adult prisons, but is provided with forms of treatment and rehabilitation. Furthermore, throughout the entire judicial process, the juvenile faces not a court empowered with a limitless degree of discretion and authority to act as it sees fit, but is accorded a process which respects both the juvenile's right to fair treatment and due process of laws.

As is often the case, however, appearances can be very deceiving. In bestowing to the juveniles of this Commonwealth most of the procedural safeguards given to adult offenders, the legislature had unwittingly placed its imprimatur on a whole range of constitutional and evidentiary attacks to delinquency adjudications. With an ever increasing frequency, juveniles seize upon the polestar of *Gault* and its progeny and use it as a springboard to obtain more and more "adult" rights and privileges.

Over the last twenty years, courts of this Commonwealth have been deluged with a steady downpour of such cases. In each, the juvenile offender comes to the adjudicatory hearing armed with a varied assortment of adult rights and privileges, ranging from the Fourth Amendment protection against unreasonable searches and seizures to the basic rules of evidence in criminal trials, and expects the court to dutifully apply such standards on his or her behalf. If such standards do not prove exonerative, then the young miscreant fully expects to receive the full range of benefits of the juvenile system.

The judicial response to such efforts has been untenable. Instead of refusing to extend the full panoply of adult rights to juveniles and, thus, empowering the juvenile system to care for and protect our troubled youths, we have blindly acceded to the juvenile's requests. Accordingly, we have held that juveniles are entitled to: 1) the Fourth Amendment's protection against unreasonable searches and seizures by govern-

mental officials;[20] 2) the adult "totality of the circumstances" standard in determining whether one knowingly and voluntarily waived the right to remain silent;[21] 3) the effective assistance of counsel during all phases of the delinquency proceedings;[22] 4) the full protection of the rules of evidence, including protection from being adjudged delinquent solely on the basis of hearsay testimony;[23] and 5) the adult standard requiring

**20.** In *In re Harvey*, 222 Pa.Super. 222, 295 A.2d 93 (1972), we announced for the first time that juveniles are entitled to "as strong a right as that of an adult" to the protections of the Fourth Amendment. Although this precise issue has not been reviewed by either the Pennsylvania or the United States Supreme Court, its ruling has become so deeply entrenched in our system of jurisprudence, that the juvenile status of the person seeking the Fourth Amendment's protection is rarely even considered. *See, e.g., In the Interest of J.H.*, 424 Pa.Super. 224, 622 A.2d 351 (1993) (suppressing contraband discovered in juvenile's possession in the absence of probable cause for warrantless search). *But see Id.* (Cirillo, J., dissenting) (arguing that the full panoply of constitutional rights afforded to adults should be relaxed, in order to better achieve the goals of the Juvenile Act).

**21.** There has been considerable discussion within the courts of this Commonwealth regarding the proper standard to evaluate the waiver of the right to remain silent by juveniles. The original standard was announced in *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975). In *McCutchen*, the Pennsylvania Supreme Court announced the *per se* requirement that a juvenile must have the opportunity to consult with an interested and informed adult before waiving the right to remain silent. This view was overruled with the Supreme Court's decision in *Commonwealth v. Christmas*, 502 Pa. 218, 465 A.2d 989 (1983). In *Christmas*, the Court held that there was a rebuttable presumption that a juvenile lacks competence to waive the right to remain silent without first consulting with an interested and informed adult. In *Commonwealth v. Williams*, 504 Pa. 511, 475 A.2d 1283 (1984), the Supreme Court overruled *Christmas* and set forth the adult "totality of the circumstances" standard in determining whether a juvenile had knowingly and voluntarily waived the right to remain silent. For a complete analysis of the history of this rather mercurial standard, *see* Comment, *Now My Son, You Are a Man: The Judicial Response to Uncounseled Waivers of Miranda Rights By Juveniles in Pennsylvania*, 92 Dickinson.L.Rev. 153 (1987).

**22.** *See Matter of Smith*, 393 Pa.Super. 39, 573 A.2d 1077 (1990); *In re DelSignore*, 249 Pa.Super. 149, 375 A.2d 803 (1977).

**23.** *See In the Interest of LaMore*, 356 Pa.Super. 322, 514 A.2d 633 (1986); *Commonwealth v. McNaughton*, 252 Pa.Super. 302, 381 A.2d 929 (1977). Recently, we have expanded this rule and held "that a juvenile's probation cannot be revoked solely on the basis of extrajudicial statements made by an accuser whom the juvenile has not been permitted to confront." *In the Interest of Davis*, 377 Pa.Super. 46, 546

probable cause before a warrantless arrest.[24]

The juvenile's request for and the judiciary's extension of adult rights to juvenile proceedings, we submit, misses the point of the Juvenile Act. The Juvenile Act was not enacted to dole out punishments for the crimes of our wayward youths; to the contrary, it was enacted to determine the proper therapeutic course on which to launch the young offender. In extending adult rights to the juvenile offender, we vilify this profound and lofty goal and do the juvenile a double disservice—we do not provide the care and rehabilitation he so desperately needs, and we teach him to hire experienced counsel to search for legal technicalities to hide behind.

Perhaps the time has come for the legislature to do away with the Juvenile Act. If we continue to permit young offenders to flout its purpose, neither the juveniles nor society benefit from its benevolent offerings. Let us not forget that these juveniles are not simply skipping school or otherwise performing childish pranks, they are committing adult crimes and are injuring innocent victims. If these young miscreants want all the adult rights, perhaps we should give them all the adult punishments concomitant with them.

The case at hand is indicative of the crisis befalling the juvenile system. Even though the police caught young K.B. with ten vials of crack cocaine in his possession, instead of seeking and obtaining the benefit and protection of this Commonwealth's drug and alcohol programs, K.B. sought refuge behind the technicalities implicit within the shield of the Fourth Amendment. Although the search and subsequent seizure of the illicit drugs may not have comported with the strictures of the Fourth Amendment, we should not be forced to countenance a result which denies K.B. the care and rehabilitation he so obviously requires.

A.2d 1149 (1988) (*aff'd*, by an equally divided Supreme Court, 526 Pa. 428, 586 A.2d 914 (1991)).

24. In *In Interest of A.P.*, 421 Pa.Super. 141, 617 A.2d 764 (1992), we suppressed the admission of 64 vials of crack cocaine found on the person of A.P. and vacated the disposition of delinquency entered against him, solely because the police had no probable cause to arrest A.P.

The courts of this Commonwealth go too far by extending such safeguards as the Exclusionary Rule to juvenile proceedings. In these increasingly violent times, we must be ever cognizant that in being adjudged delinquent, juveniles such as K.B. are neither convicted of a crime, nor incarcerated in adult prisons. Now more than ever, we cannot afford to send a message to our misguided young people, that they may act with impunity, yet still receive the full range of adult constitutional protections. After all, we must never forget that in creating a separate juvenile system, the Commonwealth did not seek to "punish an offender but to salvage a boy who may be in danger of becoming one...." *In re Holmes,* 379 Pa. 599, 603, 109 A.2d 523, 525 (1954).

In 1967, when the United States Supreme Court set into motion the process which extended adult procedural rights to juvenile proceedings, it could not have envisioned the extent to which its course correction would be taken. Instead of simply leveling the procedural playing field between the adult and juvenile systems, *In re Gault* and its progeny began a journey which has taken us dangerously far from original intent, the "care and rehabilitation" of young offenders. And so it becomes clear that while today we quash K.B.'s appeal as interlocutory and are able to continue his treatment and rehabilitation, without a fundamental change in the current system, tomorrow we might not be so fortunate.

Appeal quashed.

BROSKY, J., concurs in the result.