CIRILLO, Judge:
 

 J.R., a thirteen year-old juvenile, appeals from an order of the Court of Common Pleas of Westmoreland County adjudicating him delinquent for the acts of indecent assault and involuntary deviate sexual intercourse. We affirm.
 

 The pertinent testimony presented at the adjudication hearing is as follows: A.B., the four year-old female victim, testified that on July 7, 1998 she was left at her aunt’s home by her mother, when she began playing in the woods with her cousins, Daniel Powell, age 8, Jeff Powell, age 4, and J.R. While in the woods, A.B. testified that J.R. took off her shorts, lifted her up, and licked her vaginal area with his tongue five times. Shortly after this incident occurred, A.B. related to both her aunt and her mother what had happened. On July 22, 1993, A.B. corroborated this account with Trooper James Sileo of the Pennsylvania State Police.
 

 Daniel Powell witnessed the incident in question. He testified that J.R. licked A.B.’s vaginal area while the four children were playing in the woods and that both he and A.B. informed A.B.’s aunt and mother of what had occurred. Daniel Powell also stated that he was unsure whether A.B.’s shorts were on or off during the incident.
 

 A.B.’s aunt testified that J.R. had been residing with her since the death of her sister, J.R.’s mother. She also testified that both A.B. and Daniel came into the house to tell her what had occurred. When J.R. testified, he denied that the incident ever occurred. He claimed that the only time he touched A.B. was to lift her over the “jaggers,” so that she would not get thorns in her feet. J.R. also claimed that Daniel could not have seen him pick up A.B., since Daniel was on the other side of the bushes.
 

 Following the hearing, J.R. was adjudicated delinquent for the acts of involuntary deviate sexual intercourse and indecent assault. He was ordered to be held at the Juvenile Detention
 
 *420
 
 Center pending a disposition hearing. At the disposition hearing, J.R.’s Juvenile Probation Officer, Jeremy Olson, testified to his findings pursuant to his Pre-Sentencing Investigation. He testified that J.R. would become uncooperative when asked about sexual questions and from the results of one of the tests, J.R. did not find that it was abnormal for sex to occur between an adult and an adolescent. The doctors who interviewed J.R. regarding his mental capacity and mental functioning recommended that J.R. be placed in a juvenile detention home. The court ordered that J.R. be placed at the Appalachian Youth Services-Julian House in Ebensburg, Pennsylvania and that J.R. attend and successfully complete the Juvenile Services Sexual Offender Program and the Appalachian Youth Services Day Treatment Program. This appeal followed.
 

 J.R. presents three issues on appeal for our consideration:
 

 (1) Is a four year-old alleged victim, who appears to appreciate the difference between lying and telling the truth, and who states that she will be punished for lying, incompetent to testify when she directly contradicted herself by stating that it is “good to lie,” especially when her testimony demonstrates that she could not respond to the questions posed with intelligent answers?
 

 (2) Was the four year-old alleged victim’s testimony that her pants were down when the alleged incident occurred, enough evidence of penetration when this testimony was directly contradicted by a witness who observed the alleged incident?
 

 (3) Even if there is sufficient evidence to convict the appellant of involuntary sexual deviate intercourse, did the prosecution introduce enough evidence to establish a sufficient independent factual basis to convict the appellant of the lesser offense of indecent assault.
 

 J.R. first argues that the trial court abused its discretion when it qualified A.B. competent to testify. Specifically, J.R. contends that AB. did not understand her duty to tell the truth. We disagree.
 

 
 *421
 
 In reviewing a challenge of an evidentiary nature such as competency of a witness to testify, a witness is presumed competent to testify unless proven otherwise.
 
 Commonwealth v. Trimble,
 
 419 Pa.Super. 108, 114, 615 A.2d 48, 51-52 (1992). The burden to prove that a witness is not competent falls on the objecting party.
 
 Commonwealth v. Short,
 
 278 Pa.Super. 581, 586, 420 A.2d 694, 696 (1980) (citing
 
 Rosche v. McCoy,
 
 397 Pa. 615, 156 A.2d 307 (1959)). This court has noted that when a witness is under fourteen years of age, there must be a judicial inquiry into his or her mental capacity.
 
 Commonwealth v. Gaerttner,
 
 335 Pa.Super. 203, 214, 484 A.2d 92, 98 (1984). Nonetheless, the determination of a witness’ competency to testify is left to the sound discretion of the trial judge, and we will not reverse the judge’s ruling on the matter absent a flagrant abuse of that discretion.
 
 Short,
 
 278 Pa.Super. at 586, 420 A.2d at 696.
 

 The relevant inquiry into the competency of a child to testify is well established:
 

 There must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what is it that she is called to testify about, and (3) a consciousness of the duty to speak the truth.
 

 Commonwealth v. Trimble,
 
 419 Pa.Super. at 114, 615 A.2d at 50 (citing
 
 Rosche v. McCoy,
 
 397 Pa. at 620-21, 156 A.2d at 310).
 

 In the case at hand, J.R. does not dispute that A.B. met the first two requirements of
 
 Trimble;
 
 that is, that A.B. had the capacity to communicate and that A.B. had the mental capacity to observe the occurrence and effectively remember it.
 
 [1]
 
 Instead, J.R. argues that A.B. did not comprehend that she had a duty to tell the truth, because she repeatedly indicated at the adjudicatory hearing that it was “good to lie.” A review of the pertinent testimony of A.B. is in order.
 

 
 *422
 
 On cross-examination by J.R.’s defense counsel, David Regoli, the following exchange with A.B. took place:
 

 Q: A.B., what color are the flags behind you? Do you know what colors those are?
 

 A: Red and Blue.
 

 Q: Now if I told you that those flags were black; what is that?
 

 A: A lie.
 

 Q: So I would be telling a lie; right?
 

 A: (The witness indicates yes).
 

 Q: Is that good or bad?
 

 A: Good.
 

 Q: Pardon me?
 

 A: Good.
 

 Q: It’s good to tell a lie?
 

 A: (The witness indicates yes).
 

 Q: Are you sure?
 

 A: (The witness indicates yes).
 

 On redirect examination by Assistant District Attorney Tamara Bernstein, however, the following testimony was elicited:
 

 Q: A.B., if you tell somebody something that didn’t happen will you get into trouble?
 

 A: (The witness indicates yes).
 

 Q: If you tell your mom something bad that happened or something good that happened and it didn’t happen, will she be happy with you or sad?
 

 A: Sad.
 

 Q: If you tell something that didn’t happen, would God be happy with you or sad?
 

 A: Sad.
 

 Q: So if David told you those flags were black and he wanted you to know that those flags were black; does that make you happy or sad when he tells you that they’re black when you know they’re red and blue?
 

 
 *423
 
 A: They’re red and blue.
 

 Q: Right do you know that you can get into trouble if you say something that didn’t happen?
 

 A: (The witness indicates yes).
 

 jfc sj: íjs s¡« sk sjc
 

 Q: Do you you know that you can get into trouble if you say something happened when it didn’t happen? Do you know you can get into trouble if you say something that didn’t happen?
 

 A: Yes.
 

 Q: If I say you and I went to the zoo today, did we go to the zoo today and see animals; yes or no? Did we go or were we in my office?
 

 A: In your office.
 

 Q: Do you know how to read yet or do you have to learn more?
 

 A: I’m going to learn more.
 

 Q: You know how to look at pictures. Do you know how to color?
 

 A: Uh-huh.
 

 Q: If you spilled milk and your mom asked you and you said no and she found out that you did; would that be bad or good?
 

 A: Bad.
 

 Q: If you told her you didn’t spill the milk when you did would that be a lie?
 

 A: (The witness indicates yes).
 

 Q: I need you to say yes or no.
 

 A: Yes.
 

 Q: And would you get into trouble for lying? Would your mom be mad at you if you lied?
 

 A: Yeah.
 

 While we agree that the record does indicate some inconsistency regarding AB.’s comprehension of her duty to speak the truth, this does not necessarily signify an abuse of discretion
 
 *424
 
 by the trial court. In
 
 Commonwealth v. Short,
 
 278 Pa.Super. 581, 420 A.2d 694 (1980), we stated that:
 

 There is more to a child’s consciousness of the duty to speak the truth than being able to give a clear example of a lie or to understand the concept of an ‘oath.’ In fact, the trial judge’s opportunity to observe the demeanor, alertness, thoughtfulness, and sincerity of a child witness may be more informative than the answers the child gives to questions such as “What is a he?’ and ‘What will happen to you if you tell a lie?’
 

 Id.
 
 at 588, 420 A.2d at 697 (citing
 
 Commonwealth v. Mangello,
 
 250 Pa.Super. 202, 206, 378 A.2d 897, 899 (1977)). In
 
 Short,
 
 we further held that if the child witness understood that the judge and her parents would punish her if she told a lie, then this is sufficiently indicative of her understanding of the duty to tell the truth.
 
 Id.; see also Commonwealth v. Riley,
 
 458 Pa. 390, 326 A.2d 384 (1974) (finding a six year-old witness competent to testify after the witness stated that he would “Go to the Devil” if were to tell a lie);
 
 Commonwealth v. Payton,
 
 258 Pa.Super. 140, 392 A.2d 723 (1978) (holding that a six year-old was competent to testify after indicating that her mother would punish her if she told a lie).
 

 In the case at hand, we are convinced that, despite her inconsistent testimony, A.B. understood her duty to tell the truth. Although she did repeatedly indicate that it was “good to tell a lie,” she also stated that she would be punished if she did so. Based upon our thorough review of the record and the conclusions reached at the adjudicatory hearing by the trial court, we find that A.B. was competent to testify. Accordingly, J.R.’s first argument is without merit.
 

 J.R. next argues that the Commonwealth adduced insufficient evidence to adjudicate him delinquent for the act of involuntary deviate sexual intercourse. We disagree.
 

 In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the
 
 *425
 
 trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt.
 
 Commonwealth v. Swann,
 
 431 Pa.Super. 125, 128, 635 A.2d 1103, 1105 (1994);
 
 Commonwealth v. Jarman,
 
 529 Pa. 92, 94-95, 601 A.2d 1229, 1230 (1992). “This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.”
 
 Commonwealth v. Swerdlow,
 
 431 Pa.Super. 453, 458, 636 A.2d 1173, 1176 (1994) (citing
 
 Commonwealth v. Hardcastle,
 
 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988)). It matters not whether the appellant finds a witness’ testimony lacking in credibility; such matters are solely within the province of the jury as trier of fact and, as such, will not be assailed on review by this court.
 
 Id.
 
 This standard is equally applicable in juvenile delinquency proceedings.
 
 In re D.D.,
 
 409 Pa.Super. 35, 597 A.2d 648 (1991).
 

 Furthermore, the testimony of the victim, standing alone, is sufficient to convict in sex offense prosecutions.
 
 Commonwealth v. Purcell,
 
 403 Pa.Super. 342, 350, 589 A.2d 217, 221 (1991);
 
 Commonwealth v. Cody,
 
 401 Pa.Super. 85, 89, 584 A.2d 992, 993 (1991);
 
 Commonwealth v. Ziegler,
 
 379 Pa.Super. 515, 520, 550 A.2d 567, 569 (1988). Minor discrepancies in testimony pointed out by an appellant does not make the evidence insufficient where those discrepancies are not significant.
 
 Cody,
 
 401 Pa.Super. at 89, 584 A.2d at 993;
 
 Commonwealth v. Maute,
 
 336 Pa.Super. 394, 406, 485 A.2d 1138, 1145 (1984).
 

 The crime of involuntary deviate sexual intercourse occurs when an individual engages in “deviate sexual intercourse” with another person:
 

 (1) by forcible compulsion; (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution; (3) who is unconscious; (4) who is so mentally deranged or deficient that such person is incapable of consent; or (5)
 
 who is less than 16 years of age.
 

 
 *426
 
 18 Pa.C.S.A. § 3123 (emphasis added);
 
 Ziegler,
 
 379 Pa.Super. at 518, 550 A.2d at 569 (1988). “Deviate sexual intercourse” is defined,
 
 inter alia,
 
 as sexual intercourse between two people who are not husband and wife. 18 Pa.C.S.A. § 3101;
 
 Ziegler,
 
 379 Pa.Super. at 518, 550 A.2d at 569. Deviate sexual intercourse is considered to have occurred if one’s mouth or tongue penetrates the vaginal area of another.
 
 Commonwealth v. Westcott,
 
 362 Pa.Super. 176, 191, 523 A.2d 1140, 1147 (1987). Additionally, we note that “actual” penetration of the vagina is not necessary; some form of oral contact with the genitalia of the female victim is all that is required.
 
 Commonwealth v. Trimble,
 
 419 Pa.Super. at 112, 615 A.2d at 50.
 

 In the case at hand, A.B. testified that, while she and her cousins were playing the woods, J.R. licked her vaginal area five times. This account, consistently related to A.B.’s mother, her aunt, and Trooper Sileo, was corroborated by Daniel Powell, who witnessed the incident in question. Although Daniel Powell was unsure whether A.B.’s shorts were on or off during the attack, the trial court was well within its discretion in relying solely on the testimony of the victim.
 
 Purcell, supra.
 
 Accordingly, we find that the Commonwealth has adduced sufficient evidence that J.R. committed the act of involuntary deviate sexual intercourse upon A.B.
 

 J.R.’s final argument is that the Commonwealth adduced insufficient evidence to adjudicate him delinquent for the act of indecent assault. We disagree.
 

 Indecent assault is defined as:
 

 A person who has indecent contact with another not his spouse, or causes such other to have indecent contact, with him is guilty of indecent assault, a misdemeanor of the second degree if,
 

 (1) He does so without the consent of the other person; or
 

 Hi Hs Hí Hs ❖ *
 

 (3) He knows that the other person is unaware that a indecent contact is being committed.
 

 
 *427
 
 18 Pa.C.S.A. § 3126. “Indecent contact” is defined as “any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in either person.” 18 Pa.C.S.A. § 3101.
 

 J.R. contends that there was no “indecent contact” between himself and A.B. since there was no other evidence of any sexual touching for the purpose of arousing or gratifying his sexual desire. This claim is without merit. The legislature of the Commonwealth established the crime of indecent assault “because of a concern for the shame, outrage, and disgust engendered in the victim, rather than because of any physical injury to the victim.”
 
 Commonwealth v. Hawkins,
 
 419 Pa.Super. 37, 44, 614 A.2d 1198, 1201 (1992) (citations omitted). Moreover, “[d]ue to the nature of the offenses sought to be proscribed by the indecent assault statute, and the range of conduct proscribed, the statutory language does not and could not specify each prohibited act.”
 
 Id.
 
 Clearly, it does not strain the very limits of credulity to suggest that, when J.R. removed A.B.’s clothing, lifted her up, and licked her vaginal area, his conduct fell within the purview of the indecent assault statute. Accordingly, J.R.’s argument is once again without merit.
 

 Although we presently affirm J.R.’s adjudication of delinquency, we think it extremely important to pause and address the distressing implications inherent in our decision. In the case at hand, J.R., age 13, sexually assaulted his four year-old cousin A.B. For this deplorable act, the trial court placed J.R. within a juvenile detention center, where he is required to complete the Juvenile Services Sexual Offender and the Appalachian Youth Services Day Treatment Programs. Once completing these programs, J.R. will be placed on probation for an indeterminate period of time. While we sincerely hope that J.R.’s stay within our juvenile system will cure him of his criminal propensities, we fear that it will not, and that the public at large, upon J.R.’s release, will remain perilously unaware of the menace that he presents to their children and to society.
 

 
 *428
 
 Under the current construction of the Juvenile Act, 42 Pa.C.S.A. § 6301
 
 et seq.,
 
 unless a juvenile fits within a decidedly narrow class of offenders, the record of that juvenile’s crimes is not made available to the public as a whole. Specifically, section 6308 of the Juvenile Act provides:
 

 (b) Public availability—
 

 (1) The contents of law enforcement records and files concerning a child shall not be disclosed to the public except if the child is 14 or more years of age at the time of the alleged conduct and if any of the following apply:
 

 (i) The child has been adjudicated delinquent by a court as a result of an act or acts which include the elements of rape, kidnapping, murder, robbery, arson, burglary, violation of section 13(a)(3) of the ... Controlled Substance, Drug, Device, and Cosmetic Act, or other act involving the use of or threat of serious bodily harm.
 

 (ii) A petition alleging delinquency has been filed by a law enforcement agency alleging that the child has committed an act of acts which includes the elements of rape, kidnapping, murder, robbery, arson, burglary, violation of section 13(a)(3) of the ... Controlled Substance, Drug, Device, and Cosmetic Act, or other act involving the use of or threat of serious bodily harm and the child previously has been adjudicated delinquent by a court as a result of an act or acts which included the elements of one of such crimes.
 

 (iii) The child is a dangerous juvenile offender.
 

 42 Pa.C.S.A. § 6308(b) (emphasis added). A child is considered a “dangerous juvenile offender” under subsection (iii) only if a court determines that he or she meets all of the following requirements:
 

 (1) Is 15 years of age or older.
 

 (2) Has been adjudicated delinquent for one or more of the following offenses:
 

 (i) Attempted murder.
 

 (ii) Voluntary manslaughter.
 

 (iii) Rape.
 

 
 *429
 
 (iv) Involuntary deviate sexual intercourse.
 

 (v) Kidnapping.
 

 (vi) Robbery.
 

 (vii) Felonious aggravated assault.
 

 (viii) Aggravated assault with a deadly weapon.
 

 (ix) Arson.
 

 (3) Has been previously adjudicated delinquent subsequent to the child’s 12th birthday for one or more of the following offenses:
 

 (i) Attempted murder.
 

 (ii) Voluntary manslaughter.
 

 (iii) Rape.
 

 (iv) Involuntary deviate sexual intercourse.
 

 (v) Kidnapping.
 

 (vi) Robbery.
 

 (vii) Felonious aggravated assault.
 

 (viii) Aggravated assault with a deadly weapon.
 

 (ix) Arson.
 

 An adjudication for an offense arising from the same criminal episode as the offense considered under paragraph (2) shall not be considered an adjudication for the purpose of this paragraph.
 

 42 Pa.C.SA, § 6302 (emphasis added). Thus, under the Juvenile Act, upon J.R.’s release from juvenile detention, the public will remain wholly uninformed of the potential danger he represents to society, as J.R. falls under none of the three excepted classifications; he was under age 14 at the time he committed his delinquent acts, and even if he was over age 14, he neither committed one of the acts enumerated in section 6308(b)(i), nor had been previously adjudicated delinquent. As a result of this statutory prohibition, the citizens of this Commonwealth cannot take the steps necessary to ensure the safety of their children, but must instead rely on our system of rehabilitative treatment to “cure” the young offender and render him a productive and law abiding member of society.
 

 
 *430
 
 The legislature of this Commonwealth enacted the Juvenile Act to effectuate the twin aims of rehabilitating the young offender and of protecting society by curing the young miscreant of his or her criminal proclivities. 42 Pa.C.S.A. § 6301(b)(2);
 
 In the Interest of McDonough,
 
 287 Pa.Super. 326, 333, 430 A.2d 308, 312 (1981). The Juvenile Act is set up under a broad umbrella, where “the juvenile courts can operate fairly, yet with a degree of flexibility and informality.”
 
 In re K.B.,
 
 432 Pa.Super. 586, 598, 639 A.2d 798, 804 (1994).
 

 Under the Juvenile Act, delinquency proceedings commence after a juvenile has been taken into custody by law enforcement officials. 42 Pa.C.S.A. § 6324. Once the youngster is in custody, the proceedings are separated into two distinct phases: the adjudicatory and the dispositional. During the adjudicatory phase, the juvenile’s case is considered by a judge, sitting without a jury. 42 Pa.C.S.A. § 6336(a). This hearing is designed to determine whether the juvenile committed acts which necessitate a finding of delinquency.
 
 [2]
 
 “If, after reviewing the evidence presented by the [pre-hearing] petition and at the hearing, the juvenile court finds beyond a reasonable doubt that the child committed the delinquent act(s), it shall adjudge the juvenile, delinquent.”
 
 K.B.
 
 at 598, 639 A.2d at 804 (citing 42 Pa.C.S.A. § 6341(d)).
 

 Once the juvenile is adjudged delinquent, the case proceeds to the dispositional phase, where the court must determine whether the child is in “need of treatment, supervision, and rehabilitation____” 42 Pa.C.S.A. § 6341(b). After reviewing “all evidence helpful in determining the questions presented” including oral and written “social reports,” the court “may impose a dispositional order calculated to provide the juvenile with a form of care and treatment for his individualized problems.”
 
 K.B.
 
 at 599, 639 A.2d at 804 (citing 42 Pa.C.S.A. § 6341(d), 6351(a)). These dispositions include, among other things: placing the child on probation; committing the child to
 
 *431
 
 an appropriate institution or rehabilitation center; or ordering the child to pay fines, costs, or restitution. 42 Pa.C.S.A. § 6352.
 

 Throughout the entire process, moreover, the juvenile is treated far differently than his or her adult counterpart. A juvenile is shielded from public scrutiny as all hearings are closed to the general public. 42 Pa.C.S.A. § 6336(d). “[U]pon a finding of delinquency, the juvenile is not branded with the stigma of a criminal conviction, but is simply adjudged delinquent. The juvenile is not sentenced to lengthy terms in adult prisons, but is provided with forms of treatment and rehabilitation. Furthermore, throughout the entire judicial process, the juvenile faces not a court empowered with a limitless degree of discretion and authority to act as it sees fit, but is accorded a process which respects both the juvenile’s right to fair treatment and due process of law.”
 
 [3]
 

 K.B.
 
 at 598-99, 639 A.2d at 805. Thus, the juvenile system is not set up “to punish an offender, but to salvage a boy who may be in danger of becoming one.... ”
 
 In re Holmes,
 
 379 Pa. 599, 603, 109 A.2d 523, 525 (1954).
 

 In short, it is readily apparent that the juvenile system is based upon the fundamental premise that the rehabilitation process will be successful and that, therefore, the public need not be informed of the juvenile’s identity, as he or she will not commit additional crimes. Upon close scrutiny, however, it is apparent that the foundation of the juvenile system rests upon unstable ground. Empirical data clearly indicates that, far from rehabilitating our juvenile offenders and decreasing the incidents of juvenile criminal activity, juvenile crime in this Commonwealth and this nation is drastically on the rise.
 

 A recent study published by the Pennsylvania Commission ' on Crime and Delinquency (“PCCD”) depicts the magnitude of the escalation of juvenile crime in this Commonwealth. The
 
 *432
 
 PCCD reported the number of juvenile arrests for a variety of crimes for the years 1980 through 1991. The results of this study indicate a profound rise in the incidents of violent crimes committed by juveniles between 1988 and 1991. Arrests for murder increased by 20.3 percent, for rape by 16.6 percent, for aggravated assault by 28.8 percent, for robbery by 32.1 percent, and for arson by 19.1 percent.
 
 [4]
 

 See
 
 PCCD BUREAU OF STATISTICS AND POLICY RESEARCH, PENNSYLVANIA JUVENILE ARRESTS FOR PART I CRIMES, 1980-1991 (1993).
 

 The rate of juvenile crime nationally is also sharply on the rise. In July of 1994, the United States Department of Justice released the results of a study concerning the increase in juvenile crime from 1988 to 1992. Specifically, the Justice Department found a large upsurge in the number of serious offenses committed by juveniles. For example, murder increased by 55 percent, rape by 27 percent, aggravated assault by 80 percent, robbery by 52 percent, and arson by 24 percent.
 
 [5]
 

 See
 
 JEFFREY A. BUTTS, U.S. DEP’T OF JUS
 
 *433
 
 TICE, DELINQUENCY CASES IN JUVENILE COURT, 1992 (Fact Sheet # 18, July, 1994).
 

 The increased incidents of juvenile crime, moreover, is not limited to violent crimes. Since 1980, juvenile arrest rates for heroin and cocaine related crimes increased more than 700 percent. In 1990, one in every five high school students admitted to carrying a weapon sometime during the past month, while one in twenty admitted to carrying a gun. Since 1988, juvenile car theft has increased 34 percent, while vandalism has increased by 50 percent.
 
 See
 
 BARBARA ALLENHAGEN AND MELISSA SICKMUND, U.S. DEPT OF JUSTICE, JUVENILES AND VIOLENCE: JUVENILE OFFENDING AND VICTIMIZATION (Fact Sheet # 3, July, 1993). Equally alarming is the recidivism rate of juvenile offenders. In a 1987 study, the Center for Juvenile Justice Training and Research determined that 55 percent of all juveniles who were placed in public or private rehabilitation centers in this Commonwealth were rearrested following their release.
 
 [6]
 

 See
 
 LYNNE GOODSTEIN, CENTER FOR JUVENILE JUSTICE AND TRAINING, A STUDY ON THE IMPACT OF TEN PENNSYLVANIA RESIDENTIAL PLACEMENTS ON JUVENILE RECIDIVISM (September 1987). In short, juvenile crime in the nation and in this Commonwealth is climbing by unprecedented rates, reaching unprecedented levels. The juvenile system, designed to curb the excesses of youth and to lessen the incidents of criminality, has proved neither an effective deterrent nor a successful tool for rehabilitation.
 

 The result of the system’s failure is that the juvenile offender receives all of the benefits that the legislature provided under the Juvenile Act, while the general public is left wholly
 
 *434
 
 unaware that a given youngster might pose a threat to them, in general, and to their individual families, in particular. We cannot countenance such a consequence. Society needs to be protected from present day Fagins,
 
 [7]
 
 who impudently thrive by thrusting our wayward children into a life of crime, as they know these children will not receive criminal sentences and will not be cast in the public eye. Parents need to be informed that the youngster next-door has a history of sexual offenses, so that their children can be free to play and run about in relative safety. School teachers and principals need to be notified that youngsters in their charge have a history of violent crimes, in order to ensure that our schools remain a safe place in which to learn.
 

 We are fully cognizant that the problems concomitant with the treatment of juvenile offenders are vexing ones and that solutions are neither easily identifiable, nor readily capable of implementation. Nonetheless, we urge the legislature to examine the current state of the juvenile justice system and to develop new solutions to alleviate the current crisis surrounding juvenile crime. Some helpful suggestions spring to mind.
 

 A system could be developed whereby the young offender is treated as a juvenile throughout the adjudicatory phase of the the proceedings, but is sentenced like an adult to a period of incarceration in a separate juvenile facility. If the juvenile reaches the age of 18 and has time remaining on his or her sentence, a hearing will be convened, during which a judge will determine whether the offender has been rehabilitated. If the judge concludes that the youth poses little danger to society, then his or her sentence can be commuted; if, however, the judge is not so convinced, then the juvenile can be sent to finish his or her term in an adult prison. This system would ensure that juveniles are punished according to the severity of their crimes and would work to provide a fair incentive to the juvenile to fully partake in the rehabilitation process.
 

 
 *435
 
 Another potential solution would be to vest within the trial judge’s authority broad discretion to handle each juvenile on a case-by-case basis. Instead of handcuffing the trial court with strict sentencing guidelines, the judge could consider the severity of the crimes committed, the youth’s potential for rehabilitation, and the juvenile’s past history and background, and fashion an appropriate sentence. Under this system, the trial court could choose from a far broader array of potential punishments for our wayward youths. If, for example, the trial court believed that a first-time juvenile offender, who committed a dangerous crime such as rape or armed robbery, was incapable of rehabilitation, then the trial court could impose a sentence to be served in an adult prison. This system would enable the trial judge, the individual in the best position to explore the full range of options available, to set forth a suitable sentence.
 

 Finally, the legislature could quite simply opt to leave the present system substantially intact, but choose to disclose to the public the records of the juvenile offenders. Although this solution would run counter to many of the present rehabilitative goals of the juvenile system as a whole, it would most surely provide a measure of safety and protection that the citizenry of this Commonwealth do not currently enjoy.
 

 Whatever solution is ultimately instituted, one thing is incontrovertibly clear, the juvenile system needs to be fundamentally reevaluated to reflect the crisis surrounding its current operation. With juvenile crime rising to unprecedented levels, unprecedented action is required by the legislature. We can no longer afford to subject young children, like A.B., to the consequences of continued inaction and the status quo. And so, while today we affirm the order of the trial court sending young J.R. to juvenile detention and can only hope that he will be rehabilitated, let us take steps to ensure that tomorrow carries with it more certainty.
 

 Order affirmed.
 

 [1]
 

 . The record bears out this concession by J.R. as A.B.’s testimony and her other accounts of the incident in question were consistent and well articulated.
 

 [2]
 

 . A "delinquent act” is defined as "an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under Federal law, or under local ordinance.” 42 Pa.C.S.A. § 6302.
 

 [3]
 

 . Of course, if it is alleged either that the juvenile committed the act of murder, or that the juvenile committed a felony and is not considered “amenable to treatment, supervision, or rehabilitation as a juvenile,” then the case may be transferred to adult criminal court. 42 Pa.C.S.A. § 6355.
 

 [4]
 

 . The PCCD released the following figures regarding the increase in juvenile crime in this Commonwealth:
 

 [[Image here]]
 

 [5]
 

 . The Justice Department released the following figures regarding the upsurge in serious juvenile offenses from 1988 to 1992:
 

 [[Image here]]
 

 
 *433
 
 JEFFREY A. BUTTS, U.S. DEP'T OF JUSTICE, DELINQUENCY CASES IN JUVENILE COURT, 1992 (Fact Sheet # 18, July, 1994).
 

 [6]
 

 . The study indicated that the younger a juvenile was at his or her first arrest, the more likely that he or she was to be arrested upon release. The study also determined no correlation between race, chemical dependency, or family stability on the likelihood of recidivistic behavior.
 

 [7]
 

 . Fagin is that most memorable character created by Charles Dickens in Oliver Twist, who preyed on orphaned children, forcing them to commit all manner of crimes for his own benefit.